[Cite as *State v. Stephenson*, 2015-Ohio-233.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2014-05-073 |
| | : | O P I N I O N |
| - vs - | | 1/26/2015 |
| | : | |
| STEVEN D. STEPHENSON, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 13CR29599

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Thomas G. Eagle, 3386 N. State Route123, Lebanon, Ohio 45036, for defendant-appellant

**HENDRICKSON, J.**

{¶ 1} Defendant-appellant, Steven D. Stephenson, appeals a decision of the Warren County Court of Common Pleas denying his motion to suppress. Appellant also appeals his sentence. For the reasons stated above, we affirm the decision of the trial court.

{¶ 2} On October 29, 2013, appellant was a passenger in a motor vehicle that was stopped for a traffic violation. During the traffic stop, appellant was found to be in possession of a firearm, drugs, and drug paraphernalia. On December 23, 2013, appellant was indicted

for carrying a concealed weapon, aggravated possession of drugs, possession of drug paraphernalia, and improper handling of a firearm in a motor vehicle. Attached to the aggravated possession of drugs charge was a firearm specification.

{¶ 3} Appellant moved to suppress the evidence found as a result of the traffic stop. An evidentiary hearing regarding the motion to suppress was held on March 19, 2014. At the hearing, Ohio State Highway Patrol Trooper David Grooms testified he initiated a traffic stop for a vehicle in which appellant was a passenger. Trooper Grooms explained that on October 29, 2013, he was stationed on Interstate 71 watching northbound traffic. Around 12:05 p.m., he observed a green Ford Escort traveling in the northbound lane with two male occupants. Trooper Grooms stated that both occupants were "staring straight ahead" and "displaying a rigid posture" and the driver had "both arms locked out." Trooper Grooms stated that in his experience "watching hundreds of cars go by" each day, the posture of the driver and passenger was uncommon and most people drive with their arms bent. Trooper Grooms then began following the Escort.

{¶ 4} While following the Escort, Trooper Grooms noticed the vehicle had a Georgia license plate. He then saw the Escort's right side tires travel across the white line on the right side of the highway. At approximately 12:08 p.m., Trooper Grooms activated his overhead lights and pulled over the Escort for a marked lanes violation.

{¶ 5} Trooper Grooms approached the Escort, made contact with the driver, Brandon Ottofy, and the passenger, appellant, and asked Ottofy for his license, registration, and proof of insurance. During this encounter, Ottofy appeared nervous and appellant would not make eye contact. Ottofy provided his driver's license but was unable to produce the Escort's registration or proof of insurance. Trooper Grooms then asked Ottofy to exit the vehicle and sit in his police cruiser while he checked Ottofy's driver license. Ottofy consented and Trooper Grooms conducted a pat-down search of Ottofy before placing him in the cruiser.

- 2 -

Appellant was left in the Escort.

{¶ 6} While in the police cruiser, Trooper Grooms asked Ottofy where he was traveling from, his destination, and the purpose of the trip. Ottofy stated he and appellant were from Georgia and traveling to Columbus, Ohio where the pair planned to see Ottofy's roommate. The men were going to stay one night and then drive back to Georgia the next day. Ottofy stated he had been driving for the past 11 hours. Trooper Grooms testified that Ottofy's story made him suspicious because "it is very uncommon for somebody to drive up, 10-11 hours to see someone for just overnight and turn around and drive back." Trooper Grooms also commented that while in the police cruiser, Ottofy was very talkative and "over friendly."

{¶ 7} After this conversation with Ottofy, Trooper Grooms returned to the Escort to obtain appellant's information so that he could run his driver's license. Trooper Grooms also asked appellant about their destination and the purpose of the trip. Trooper Grooms testified that appellant stated they were from Georgia but took a couple seconds to remember their destination. Appellant first just pointed north before stating they were traveling to Columbus. Appellant also told Trooper Grooms they were going to stay for a couple days and they were looking for work in Columbus.

{¶ 8} Trooper Grooms found the inconsistency between appellant's and Ottofy's stories significant. Trooper Grooms then asked appellant how long he had known Ottofy. Appellant replied that they were "longtime friends." Trooper Grooms returned to his cruiser and asked Ottofy the same question, to which Ottofy replied the pair had known each other for a month or two. After this inconsistency, Trooper Grooms requested dispatch to conduct a criminal history check on Ottofy and appellant. During this time, Ottofy asked Trooper Grooms if he was doing an "NCIC" check and Ottofy stated he "was good." Shortly after running the criminal history, Trooper Grooms requested a canine unit at 12:24 p.m. Trooper

Grooms stated that it takes approximately 15 minutes to issue a traffic citation and he could have written a traffic ticket by the time he called the canine unit. At approximately 12:45 p.m., another trooper and a drug dog arrived at the scene. Just before the canine unit arrived, the criminal history check revealed that Ottofy had an armed robbery conviction in Florida.

{¶ 9} Once the canine unit arrived, Trooper Grooms removed appellant from the Escort and explained that the troopers were going to conduct an open-air canine sniff around the vehicle. He told appellant he would be placed in the other trooper's vehicle during the canine sniff and prior to be placed in the cruiser, he would do a pat-down search of appellant for weapons. At the hearing, Trooper Grooms testified it is standard procedure to remove any remaining occupants in a vehicle that will be subject to an open-air sniff and place them in a police cruiser to ensure the safety of the occupants and the troopers.

{¶ 10} As Trooper Grooms was preparing to conduct a pat-down search of appellant, appellant stated that he had a gun. Appellant was then arrested for carrying a concealed weapon. A search incident to arrest revealed appellant was carrying a black camera bag that contained a white crystalline substance and a set of digital scales. After his arrest, appellant stated the white substance was crystal meth and made a written statement admitting possession of both the drugs and the firearm. Trooper Grooms never issued a marked lanes citation to Ottofy.

{¶ 11} On March 21, 2014, the trial court denied appellant's motion to suppress. The court reasoned that based upon all the facts presented at the scene, Trooper Grooms had reasonable, articulable suspicion to detain appellant while he conducted a more in-depth investigation and called the canine unit. The court also found that it was acceptable for Trooper Grooms to remove appellant from the Escort and conduct a pat-down search for weapons prior to placing him in the police cruiser during the canine search.

{¶ 12} After the denial of the motion to suppress, appellant entered a "no contest" plea to all counts of the indictment and the court found appellant guilty of carrying a concealed weapon, aggravated possession of drugs with a firearm specification, possession of drug paraphernalia, and improper handling of a firearm in a motor vehicle. The trial court merged improper handling of a firearm in a motor vehicle into the carrying a concealed weapon count. The court sentenced appellant to six months for carrying a concealed weapon, six months for aggravated possession of drugs, and 30 days for possession of drug paraphernalia and ran the three sentences concurrently. The court also sentenced appellant to serve one year in prison for the firearm specification to be served consecutively with all the other sentences, for a total sentence of eighteen months in prison.

{¶ 13} Appellant now appeals, asserting three assignments of error.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE.

{¶ 16} Appellant argues the trial court erred by denying his motion to suppress because the duration of the traffic stop, his removal from the Escort, and the pat-down search were unreasonable. Appellant does not dispute the initial stop for a marked lanes violation was proper. However, appellant maintains the prolonged detention beyond the time period necessary to issue a citation for the traffic violation without any reasonable, articulable suspicion of additional criminal activity was unconstitutional. Appellant also argues Trooper Grooms did not have any reasonable, articulable suspicion of criminal activity or that appellant was armed and dangerous to remove him from the vehicle and conduct a pat-down search.

{¶ 17} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶

12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

### Duration of Traffic Stop

{¶ 18} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures, including unreasonable automobile stops." *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 11. When the police stop a vehicle based on probable cause that a traffic violation has occurred, the stop is reasonable under the Fourth Amendment. *Id.* During a traffic stop, a law enforcement officer may detain a motorist for a period of time sufficient to issue a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration, and vehicle plates. *State v. Grenoble*, 12th Dist. Preble No. CA2010-09-011, 2011-Ohio-2343, ¶ 28. A passenger of a lawfully stopped vehicle may also be detained for the duration of the lawful detention of the driver. *Oatis* at ¶ 13.

{¶ 19} The detention of a stopped motorist, however, "may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." *Cochran* at ¶ 25, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 12. The continued investigatory detention does not violate the Fourth Amendment as long as it is objectively justified by the circumstances. *State v. Williams*, 12th Dist. Clinton No. CA2009-

08-014, 2010-Ohio-1523, ¶ 18. "The officer may detain the vehicle for a period of time reasonably necessary to confirm or dispel his suspicions of criminal activity." *Id.*, quoting *State v. Wynter*, 2d Dist. Miami No. 97 CA 36, 1998 WL 127092, *3 (Mar. 13, 1998). "Once the officer is satisfied that no criminal activity has occurred, then the vehicle's occupants must be released." *Id.*

{¶ 20} The existence of reasonable and articulable suspicion is determined by evaluating the totality of the circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Popp*, 12th Dist. Butler No. CA2010-05-128, 2011-Ohio-791, ¶ 13.

{¶ 21} Further, a lawfully detained vehicle may be subjected to a canine sniff of the vehicle's exterior even without the presence of a reasonable suspicion of drug-related activity. *Cochran* at ¶ 25. "If the officer conducts a canine sniff of the vehicle before the reasonable completion of the traffic stop procedures, the officer does not need additional suspicion of criminal activity to conduct the sniff." *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 22, quoting *State v. Elliott*, 7th Dist. Mahoning No. 11 MA 182, 2012-Ohio-3350, ¶ 23. "However, if the officer extends the traffic stop in order to conduct a canine sniff, he must have reasonable suspicion that the vehicle contains drugs in order to detain the driver while a canine unit is brought to the scene." *Id.*

{¶ 22} In the present case, the traffic stop began at 12:08 p.m. when Trooper Grooms pulled over the Escort for a marked lanes violation. At the hearing, Trooper Grooms stated it takes approximately 15 minutes to issue a traffic citation and he could have issued a citation at 12:24 p.m., the time he called the canine unit. The canine unit arrived at approximately 12:45 p.m. Appellant argues that detaining him beyond the period of time necessary to issue a traffic citation while the canine unit arrived was unconstitutional because it was not supported by reasonable, articulable suspicion.

{¶ 23} Based on the totality of the circumstances, Trooper Grooms had reasonable, articulable suspicion of drug-related activity to extend the duration of the traffic stop to investigate further and call the canine unit. At the hearing, Trooper Grooms testified that when the Escort passed him on the highway, appellant and Ottofy were "staring straight ahead," the men had "rigid postures," and Ottofy's arms were "locked out." Trooper Grooms explained that as an experienced Ohio State Trooper, he rarely sees occupants of a vehicle in these positions and driving with "locked out" arms is unusual because it uncomfortable. During the course of Trooper Grooms' initial contact, he observed that Ottofy was nervous, appellant failed to make eye contact, and Ottofy could not produce the vehicle's registration or proof of insurance. Trooper Grooms also testified that Ottofy and appellant were travelling from Georgia on I-71 and that I-71 is a known drug corridor. The men gave inconsistent stories regarding the purpose of their trip, the length of their stay, and how long they had been friends. The length of the drive compared to the short time the men were planning to stay in Columbus also heightened Trooper Grooms' suspicions. Trooper Grooms also stated Ottofy was "very talkative, over friendly" throughout the entire stop.

{¶ 24} In light of all the facts presented to Trooper Grooms, at 12:24 p.m. he decided to summons a canine unit to perform an exterior sniff of the vehicle. The canine unit arrived at approximately 12:45 p.m. Trooper Grooms had reasonable, articulable suspicion to detain appellant for the duration of the stop under the particular facts of this case. Under the circumstances, detaining appellant until the canine unit arrived was reasonable and did not violate appellant's constitutional rights. *See State v. Beltran*, 12th Dist. Preble No. CA2004-11-015, 2005-Ohio-4194, ¶ 20 (detaining defendant 42 minutes for canine sniff was reasonable).

{¶ 25} Further, the fact that Trooper Grooms ultimately failed to issue a citation for a marked lanes violation is not important. The Ohio Supreme Court has stated that "the

constitutionality of a prolonged traffic stop does not depend on the issuance of a citation." *Batchili*, 2007-Ohio-2204 at ¶ 21. "The failure to issue a traffic citation when there is an indication of a potentially far more significant crime is easily excused when more pressing issues are being addressed." *Id.* at ¶ 20.

{¶ 26} Based on the totality of the circumstances, Trooper Grooms had reasonable, articulable suspicion to detain appellant during the investigation. The trial court did not err in finding that appellant's Fourth Amendment rights were not violated and denying the motion to suppress on this basis.

### Removal from Vehicle and Pat-down

{¶ 27} Police officers may order the driver and passengers of a lawfully stopped vehicle to exit the car during an ordinary traffic stop without having reasonable, articulable suspicion of further criminal activity. *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330 (1977); *Maryland v. Wilson*, 519 U.S. 408, 412, 117 S.Ct. 882 (1997). A motorist may also be detained in a patrol car and subject to a brief pat-down search for weapons when an officer has a lawful reason to detain the driver in the patrol car. *State v. Evans*, 67 Ohio St.3d 405, 410 (1993). An officer does not need to have suspicion of criminal activity to detain the motorist or to conduct the pat-down search. *Id.*

{¶ 28} An officer has a lawful reason to detain a driver in a police cruiser and search the individual for weapons if the detention prevents either the officer or the individual from being subjected to a dangerous condition. *State v. Lozada*, 92 Ohio St.3d 74 (2001), paragraph one of the syllabus. Placing the individual in the cruiser, however, must be the least intrusive means of avoiding the dangerous condition. *Id.* An officer is not permitted to conduct a pat-down search of an individual before placing him in the patrol car if the sole reason is for the convenience of the officer. *Id.* at paragraph two of the syllabus. An officer may also search a passenger for weapons before detaining him in a patrol vehicle. *State v.*

*Fleak*, 12th Dist. Clermont No. CA2003-07-056, 2004-Ohio-1371, ¶ 12-13.

{¶ 29} Shortly after the canine unit arrived, Trooper Grooms removed appellant from the vehicle and explained that the troopers were going to conduct an open-air sniff of the Escort. At the suppression hearing, Trooper Grooms testified that before a canine sniff is performed, all passengers are removed from the vehicle and placed in the cruiser for the safety of the occupants and law enforcement. The occupants are removed because: "We don't want one of our canine handlers to get shot while they're walking their dog around the car." If a window is open, the dog could "jump up in the vehicle and possibly bite someone." Additionally, Trooper Grooms stated occupants are placed in a police cruiser instead of standing along the road because if an individual moves "real quick, the dog might think that they need to engage that person because they are trained to apprehend people." Trooper Grooms also explained that allowing appellant to stand alongside I-71 is dangerous because the traffic stop occurred midday, I-71 is a busy highway, the speed limit is 70 m.p.h., and heavy trucks travel on the highway.

{¶ 30} Before appellant was placed in the cruiser, Trooper Grooms started to conduct a pat-down search of appellant. Trooper Grooms explained that doing a pat-down search of appellant before placing him in the cruiser was done for officer safety. He stated: "We don't want to be shot in the back of the head or have harm to us or the person in the back of our patrol car." As Trooper Grooms was patting down appellant, appellant told Trooper Grooms he was carrying a firearm.

{¶ 31} We find that Trooper Grooms had a legitimate and lawful reason for removing appellant from the Escort, detaining him in the police cruiser, and conducting a pat-down search. Trooper Grooms removed appellant from the vehicle and placed appellant in the cruiser due to concerns about the canine engaging appellant and the busy nature of I-71. Additionally, placing appellant in the cruiser during the sniff is to protect the canine handler

from the occupants in the car. Trooper Grooms also explained that he conducted the pat-down search of appellant for officer safety. Therefore, Trooper Grooms had a legitimate, lawful reason to remove appellant from the Escort, conduct a pat-down search of appellant for weapons, and place him in the police cruiser during the canine sniff.

{¶ 32} Consequently, the trial court did not err in denying appellant's motion to suppress. Appellant's first assignment of error is overruled.

{¶ 33} Assignment of Error No. 2:

{¶ 34} THE TRIAL COURT ERRED IN CONVICTING DEFENDANT FOR IMPROPER HANDLING OF A FIREARM.

{¶ 35} Appellant argues the trial court erred in merging his two convictions that were allied offenses of similar import instead of dismissing one of the convictions entirely. Appellant was convicted of carrying a concealed weapon and improper handling of a firearm in a motor vehicle. At sentencing, the court found the two convictions to be allied offenses of similar import, merged the improper handling offense with the concealed weapon charge, and sentenced appellant for carrying a concealed weapon. Appellant maintains that because R.C. 2941.25(A) only allows for a defendant to be "convicted" of one allied offense of similar import, the trial court must dismiss the improper handling charge.

{¶ 36} The Double Jeopardy Clause of the United States Constitution and Section 10, Article I of the Ohio Constitution prohibits multiple punishments for the same offense. *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, ¶ 6. To that end, the Ohio General Assembly enacted R.C. 2941.25, Ohio's multiple-count statute, "which subjects 'allied offenses of similar import' to the judicial concept of 'merger' at sentencing." *State v. Highfield*, 12th Dist. Brown No. CA2013-05-007, 2014-Ohio-165, ¶ 6, citing *State v. Grube*, 4th Dist. Gallia No. 12CA7, 2013-Ohio-692, ¶ 45. Specifically, R.C. 2941.25(A) provides,

Where the same conduct by defendant can be construed to

constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be *convicted* of only one.

(Emphasis added.)

**{¶ 37}** The Ohio Supreme Court has stated, "for purposes of R.C. 2941.25, a 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty." (Emphasis sic.) *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 12. "In cases in which the imposition of multiple punishments is at issue, R.C. 2941.25(A)'s mandate that a defendant may be 'convicted' of only one allied offense is a protection against multiple sentences rather than multiple convictions." *Id.* at ¶ 18. Therefore, in *Whitfield*, it was error for the appellate court to order the trial court to "vacate the conviction and sentence" for the allied offense. *Id.* at ¶ 19. Instead, upon remand, the state may elect which allied offense to pursue for sentencing, the court must accept the state's choice and *merge* the crimes into a single conviction for sentencing. *Id.* at ¶ 24.

**{¶ 38}** We find that the trial court did not err in merging the improper handling charge with the carrying a concealed weapon offense. At sentencing, carrying a concealed weapon and improper handling of a firearm were found to be allied offenses of similar import and the state elected to proceed on the carrying a concealed weapon charge. The trial court then correctly merged the improper handling offense with carrying a concealed weapon for purposes of sentencing. As stated in *Whitfield*, after the state elected which allied offense to pursue for sentencing, the court must accept the state's choice, and merge the crimes into a single conviction for sentencing. *See State v. May*, 8th Dist. Cuyahoga No. 94075, 2010-Ohio-5841, ¶ 47 (error in dismissing allied offenses rather than merging convictions); *State v. Stefanopoulos*, 12th Dist. Butler No. CA2011-10-187, 2012-Ohio-4220, ¶ 46 (no error in finding defendant guilty of multiple allied offenses but sentencing for one allied offense).

**{¶ 39}** Appellant's second assignment of error is overruled.

- 12 -

{¶ 40} Assignment of Error No. 3:

{¶ 41} THE TRIAL COURT ERRED IN CONVICTING AND SENTENCING DEFENDANT FOR CARRYING A CONCEALED WEAPON AND A GUN SPECIFICATION FOR THE SAME WEAPON.

{¶ 42} Appellant argues the trial court erred in sentencing him for both carrying a concealed weapon and the firearm specification attached to aggravated possession of drugs. Appellant asserts the conduct criminalized in carrying a concealed weapon is the same conduct in the gun specification because he only carried one gun. Therefore, the concealed weapon charge and the firearm specification are allied offenses of similar import pursuant to R.C. 2941.25 and sentencing him for both offenses violates the Double Jeopardy Clause. Additionally, appellant argues R.C. 2929.14 requires that the specification and the concealed weapon offense be merged.

{¶ 43} As stated above, R.C. 2941.25 codifies the protections of the Double Jeopardy Clause and "subjects 'allied offenses of similar import' to the judicial concept of 'merger' at sentencing." *Highfield*, 2014-Ohio-165 at ¶ 6. R.C. 2941.25 provides,

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 44} The Ohio Supreme Court has held, "[p]enalties for a specification and its predicate offense do not merge under R.C. 2941.25." *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, paragraph two of the syllabus. In *Ford*, the Court reasoned that a firearm specification did not merge because it is "contingent upon an underlying felony conviction"

- 13 -

and "merely a sentencing provision that requires an enhanced penalty upon certain findings." *Id.* at ¶ 16. Therefore, "the criminal offense of discharging a firearm at or into a habitation under R.C. 2923.161 and a firearm specification as defined in R.C. 2941.145 are not allied offenses of similar import as defined in R.C. 2941.25, because a firearm specification is a penalty enhancement, not a criminal offense." *Id.* at paragraph one of the syllabus. *See Highfield* at ¶ 7; *State v. Blankenship*, 102 Ohio App.3d 534, 547 (12th Dist.1995).

{¶ 45} Based on the foregoing, we conclude that the carrying a concealed weapon offense and the firearm specification attached to the aggravated possession of drugs charge are not allied offenses of similar import as defined in R.C. 2941.25. Additionally, sentencing appellant for both the concealed weapon offense and firearm specification did not violate the Double Jeopardy Clause as the firearm specification is a penalty enhancement, not a separate criminal offense.

{¶ 46} Furthermore, appellant's argument that the firearm specification should be merged with carrying a concealed weapon pursuant to R.C. 2929.14(B)(1)(b) is also misplaced. Appellant was charged with a firearm specification pursuant to R.C. 2914.141(A) as he had a firearm on or about his person while committing the offense. A sentencing court must impose a one-year sentence when a defendant is convicted of a firearm specification under R.C. 2941.141. R.C. 2929.14(B)(1)(a)(iii). However, a court may not impose additional firearm specifications for felonies that were committed as part of the same act or transaction. R.C. 2929.14(B)(1)(b). *See State v. Ayers*, 12th Dist. Warren No. CA2011-11-123, 2013-Ohio-2641, ¶ 22. R.C. 2929.14(B)(1)(b) only prohibits the imposition of multiple sentences for *specifications* that were part of the same act or transaction. The statute does not prohibit multiple sentences for a single specification and an additional felony. Therefore, R.C. 2929.14(B)(1)(b) does not require the firearm specification and carrying a concealed weapon to be merged.

{¶ 47} Consequently, the trial court did not err in sentencing appellant for the firearm specification attached to aggravated possession of drugs and carrying a concealed weapon. Appellant's third assignment of error is overruled.

{¶ 48} Judgment affirmed.

RINGLAND, P.J., and PIPER, J., concur.