[Cite as *State v. Dunbar*, 2024-Ohio-1460.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

STATE OF OHIO,                         :

    Plaintiff-Appellee,          : CASE NO. 22CA14

v.                                     :

DEMITRI DUNBAR,                        : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.         :

_____

APPEARANCES:

Rhys B. Cartwright-Jones, Youngstown, Ohio, for appellant[1].

William L. Archer, Jr., Special Gallia County Prosecuting Attorney,
Circleville, Ohio, for appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:4-10-24
ABELE, J.

    **{¶1}** This is an appeal from a Gallia County Common Pleas Court
judgment of conviction and sentence. Demitri Dunbar, defendant
below and appellant herein, entered a no contest plea to
trafficking in cocaine.

    **{¶2}** Appellant assigns two errors for review:

---

    [1] Different counsel represented appellant during the trial
court proceedings.

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN DENYING APPELLANT-
DUNBAR'S MOTION TO SUPPRESS."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN DENYING APPELLANT-
DUNBAR'S DAUBERT MOTION UNDER EVID.R. 702."

{¶3} During a June 2020 traffic stop, Ohio State Highway Patrol Troopers Anthony Day and Drew Kuehne discovered cocaine concealed in the trunk of appellant's rental vehicle.  A Gallia County Grand Jury later returned an indictment that charged appellant with (1) one count of possession of cocaine in violation of R.C. 2925.11(A), a first-degree felony, (2) one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2), a first-degree felony, (3) one count of possession of heroin in violation of R.C. 2925.11(A), a second-degree felony, and (4) one count of trafficking in heroin in violation of R.C. 2925.03(A)(2), a second-degree felony.  Appellant entered not guilty pleas.

{¶4} Subsequently, appellant filed a motion to suppress the evidence discovered during the traffic stop and a separate motion to suppress evidence of the controlled substance testing pursuant to Evid.R. 702.  At the suppression hearing, Trooper Day testified

that around 9:30 p.m. on June 25, 2020 he noticed a vehicle with no headlights, taillights, or license plate light traveling on U.S. 35. Day stopped the vehicle, checked the license plate, then spoke with the occupants in the car, including appellant (driver), Stevon Houston (front seat passenger) and Robbie McKisaack (backseat passenger). When appellant produced a rental car agreement and a driver's license, Day noticed the occupants "overly nervous where you're shaking and you're stuttering."

{¶5} After Trooper Day explained the reason for the stop, appellant turned on his headlights. Appellant told Day he intended to go to "Beckley [West Virginia] and * * * was going to stay three or four days." Day returned to his cruiser to review the rental agreement and license. The license or ID had "no issue," but the rental agreement showed that the car had been rented that day at Chicago O'Hare Airport with a return to the same airport the next day, "so that was just a red flag for me."

{¶6} After Trooper Day returned to the vehicle, he approached the driver's side and requested appellant exit the vehicle. Day asked appellant about his plan to stay three or four days in Beckley, but pointed out "the car has to be returned back in Chicago in a day at the same airport." Appellant "kind of stumbled up on that. I think he had forgotten that he had told me that he

was going to spend three or four days there." In addition, appellant did not know the front seat passenger's name other than "Mookie." "Um, that's when I made the decision that I was going to go ahead and run my drug sniffing dog on the vehicle." Day further testified that several other facts led to his decision to utilize his canine: (1) appellant drove a rental car, (2) appellant traveled between Chicago, Illinois and Beckley, West Virginia, (3) Chicago is a "huge hub" for drugs ($1,000 worth of cocaine in Chicago is worth $3,000 in Huntington), (4) appellant did not know the front seat passenger and only knew him as "his cousin's friend," and (5) appellant's cousin sat in the rear seat.

{¶7} After a pat-down search for weapons, Trooper Day placed appellant in the backseat of Day's cruiser. Day stated that, although appellant had not been placed under arrest, he could not leave. When Trooper Kuehne arrived on the scene for back-up, approximately nine and a half minutes into the stop, Day "told him that I was going to go run my dog, but first I was going to run their criminal history. While I was waiting for their criminal history to return I'd walk the dog. So what we normally do is my backup unit will stand up by the car and just watch the passengers and also watch traffic for me * * * so as soon as I got my dog out I started walking up uh, Trooper Kuehne got my attention and held

up a baggie um, which I believed was contraband. So then it was just futile at that point to run my dog, so I put my dog back up, approached and uh, he had handed me a baggie that um, the front seat passenger, I believe it was Mr. Houston had on his lap."

{¶8} Trooper Day stated that this event occurred in less than half a minute - "just enough time for me to walk back, put my dog on a leash and start toward there." Trooper Kuehne found the suspicious bag about eleven and a half minutes into the stop, and the substance field tested for heroin.

{¶9} Trooper Day testified that at that point, he believed the officers had probable cause to search the vehicle. The officers asked the other passengers to step out of the car, patted them down for weapons, and placed them in Trooper Kuehne's cruiser. When officers searched the trunk, Kuehne pulled back the carpet and found a package that contained a white powdery substance. The officers' mobile scale recorded a weight of 377 grams. Day testified that typically it takes more than 13 minutes to issue a citation or warning and the video shows that Kuehne found the heroin on Houston's lap approximately 11 and one half minutes into the stop.

{¶10} Trooper Kuehne works in the criminal patrol unit for drug interdiction, typically along U.S. 35 in Gallia County, a "major

drug trafficking route from Columbus, Dayton, Detroit, Chicago, all of those cities to southern Ohio, West Virginia and sometimes states further south." Kuehne testified that he arrived at the scene probably a few minutes after Trooper Day began the traffic stop. When Kuehne also inquired about appellant's travel plans, appellant said, "[w]e're going to my cousin's house and then he said my cousin's brother's house." Kuehne asked, "well, wouldn't your cousin's brother probably also be your cousin?" Appellant replied, "yes." When Kuehne asked where the cousins lived, appellant said, "Beckley." Kuehne explained, "[i]t seemed like he was stumbling trying to come up with an actual purpose for why they were going to Beckley. I would say it was slightly suspicious." Day told Kuehne to approach the vehicle and tell the remaining occupants that Day planned to run his dog around the car. When Kuehne asked the two men a couple of questions, including their destination, they told Kuehne they intended to go "to Beckley, West Virginia to see some girls at a hotel." In the middle of the conversation, Kuehne also noticed "a little baggie on * * * Mr. Houston's pants, so I grabbed it, pulled it off of his pants, showed it to him um, it looks like you have a bag of drugs on your pants." Houston, who "looked kind of dazed at the time," told Kuehne he had never seen that before and did not know where it came

from. Kuehne immediately "believed [the bag] was contraband," showed the bag to Day and advised the passengers of their Miranda rights.

{¶11} Trooper Kuehne removed Houston and McKissack, searched them, then placed them in his cruiser. Audio and video recordings of the suspects inside the cruiser revealed that Houston said, "close that trunk, close that trunk" while watching Kuehne and Trooper Day search the trunk. McKissack responded, "they popped it." "They found it, mmm, mmm, mmm, that ain't our sh*t." Appellant denied knowledge of the drugs in the vehicle, although he also had acknowledged that he was responsible for the vehicle's contents. When asked if he thought appellant might have been unaware of drugs in the vehicle, Kuehne stated that he did not believe it possible because "[t]hat just to me is not realistic for three men to travel from a source city to a destination city. Uh, they gave differing stories, which means one party is lying. Uh, there's a large amount of drugs in the car. The driver of the car rented the car, which tells me that he knew the purpose of the trip."

{¶12} The state played the trooper's dash camera video at the suppression hearing and, at around minute 1:50, appellant's vehicle

stops. At 2:41, Trooper Day speaks with the occupants on the vehicle's passenger side. At 3:46, appellant hands to Day his license and rental agreement. Day then returns to his cruiser, and between 4:02 and 6:24, three chimes are heard on the recording. At 6:35, Day returns to appellant's vehicle and when asked how long he plans to stay in West Virginia, appellant says three or four days. Once again, however, the vehicle rental agreement signed that day required appellant to return the vehicle to Chicago O'Hare airport in two days.

{¶13} At minute 6:52 of the video, Trooper Day asks appellant to exit the vehicle to discuss the matter further. Day requests backup at 8:33, and, at 8:35, inquires if appellant has "ever been in any kind of trouble." At 8:44 Day asked appellant what might appear on his criminal history. At 9:09, Day informed appellant that he planned to deploy his canine to sniff the vehicle. At 9:20, Day sought permission to pat down appellant and Day performs the pat down at 9:26.

{¶14} The video further reveals that Trooper Kuehne arrived at minute 10:29 and, at 12:05, Trooper Day told Kuehne to inform the other two occupants that Day would run his dog around the car. At 13:02, Kuehne removes an object through the front passenger seat window and shows it to Day. At 14:37, officers advised the front-

GALLIA, 22CA14

seat passenger of his Miranda rights. At 20:58, officers advised appellant of his Miranda rights. At 35:41, Day advised appellant of his arrest. Officers then weighed the drugs found in the trunk and conversation is heard about appellant possessing four phones (a Galaxy, an Iphone, and 2 flip phones).

{¶15} At the April 11, 2022 Evid.R. 702 suppression hearing, Ohio State Highway Patrol Criminal Lab Supervisor Kara Klontz testified that her lab tests revealed that the more significant substance contained cocaine, that the weight of item 1-1 or 001-01 (cocaine) is 365.9 grams, plus or minus 2.8 grams, and the weight of item 1-2 (heroin) is 47.5 grams, plus or minus 2.8 grams. Klontz testified she used two methods to identify the substance, a color test and a Fourier transform infrared spectroscopy (FTIR) test, and that the chain of custody is intact. Counsel asked why Klontz's substance weight differed from the measurement of the criminalist initially assigned to this case, Alena Boyko, who measured 85.5 grams more than Klontz's weight. Klontz said she could not answer that question because she had not been present when Boyko weighed the substance.

{¶16} Supervisor Klontz's report further specified that Item #001-01 is a "sealed plastic bag enclosing a tied plastic bag

enclosing a blue zip lock bag. Heat sealed plastic bag containing a heat sealed plastic bag with white powder." The evidence, cocaine, weighed 365.9 grams, plus or minus 2.8 grams. Item #001-02 is a "sealed plastic bag enclosing a heat sealed plastic bag with two layers of tied plastic bagging. Heat sealed plastic bag holding a gray solid fragment." The evidence, heroin, weighed 47.5 grams, plus or minus 2.8 grams. The report findings included:

> The evidence in this case was retested by Klontz because the original reporting analyst was involved in a missampling event related to a separate case. Retesting was performed on all items; the results are indicated on this report. All identified compounds, as indicated in the 'findings' section of this report, were consistent with the original reported results. A difference in weight was observed for item #0011-01. The original report indicated item #0001-01 weight as 457.4g. The retest results indicate a weight for the same item (noted as 001-01) as 365.9g.

**{¶17}** Ohio State Highway Patrol Crime Laboratory Director Brandon Werry testified that since 2006, he has served as the director of the drug chemistry section. Werry explained that the lab investigated the weight discrepancy in this case and noted that when Klontz reweighed it, the weight was "fairly close" to the field weight of 377 grams.

**{¶18}** Trooper Kuehne explained that the discrepancy between his weight measurement and the official lab measurement could be because "that scale is sitting basically um, off balance on the

hood of a car." "We typically just use our scales to get a rough estimate of what degree of felony it's going to be. It's not an official number."

{¶19} After a delay caused by the withdrawal of appellant's counsel, the trial court held a plea hearing. The prosecutor recited the plea agreement and noted that, in exchange for the dismissal of the remaining charges, appellant would enter a no contest plea to Count 2, trafficking in cocaine in an amount equal to or greater than 100 grams, a first-degree felony. The trial court then reviewed the plea agreement, item by item, explained the consequences of a no contest plea, the maximum sentence, post-release control consequences, financial sanctions, and all rights appellant would waive. The court then sentenced appellant to serve the agreed recommended 11 mandatory years in prison and classified appellant a Major Drug Offender. The state dismissed the remaining counts, and appellant agreed to pay costs. This appeal followed.

I.

{¶20} In his first assignment of error, appellant asserts the trial court erred when it denied his motion to suppress evidence. In particular, appellant contends that officers violated his Fourth and Fourteenth Amendment rights when they (1) conducted an inquiry unrelated to the traffic stop aimed at investigating other crimes,

and (2) prolonged the traffic stop without additional reasonable suspicion.

{¶21} In general, appellate review of a trial court's ruling on a motion to suppress evidence involves a mixed question of law and fact. *State v. Gurley*, 2015-Ohio-5361, 54 N.E.3d 768, ¶ 16 (4th Dist.)*,* citing *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100; *State v. Jones,* 2022-Ohio-561, 185 N.E.3d 131 (4th Dist.), ¶ 15.  At a suppression hearing, a trial court acts as the trier of fact and is best positioned to resolve factual questions and evaluate witness credibility.  *Gurley; State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Therefore, appellate courts "'must accept the trial court's findings of fact if they are supported by competent, credible evidence.'"  *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 12, quoting *Burnside* at ¶ 8.  Accepting those facts as true, reviewing courts "'independently determine as a matter of law, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'"  *Id.*, quoting *Burnside* at ¶ 8.

{¶22} The Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals against unreasonable governmental searches and

seizures. *State v. Shrewsbury,* 4th Dist. Ross No. 13CA3402, 2014-Ohio-716, ¶ 14, citing *State v. Emerson,* 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15; *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion of the evidence obtained from the unreasonable search and seizure at trial." *Shrewsbury*, citing *Emerson* at ¶ 15; *State v. Harper*, 2022-Ohio-4357, 202 N.E.3d 126, ¶ 23 (4th Dist.).

**{¶23}** A traffic stop initiated by a law enforcement officer constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Thus, a traffic stop must comply with the Fourth Amendment's general reasonableness requirement. *Id.* An officer's decision to stop a vehicle is reasonable when the officer has probable cause or reasonable suspicion to believe that a traffic violation has occurred. *Id.* at 810, 116 S.Ct. 1769 (citations omitted); *accord State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23; *Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12, 665 N.E.2d 1091 (1996). Law enforcement officers also may stop a vehicle if they have reasonable suspicion "that criminal activity "'may be afoot.'"" *United States v. Arvizu*, 534

U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting

*United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104

L.Ed.2d 1 (1989), quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct.

1868, 20 L.Ed.2d 889 (1968); *accord State v. Tidwell*, 165 Ohio

St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527, ¶ 19 (officer may "make

an investigatory stop, including a traffic stop, of a person if the

officer has reasonable suspicion to believe that the person is or

is about to be engaged in criminal activity").

**{¶24}** Relevant to the case at bar, a police officer who

observes a de minimis violation of traffic laws may stop a driver.

*State v. Debrossard,* 4th Dist. Ross No. 13CA3395, 2015-Ohio-1054, ¶

13, citing *State v. Guseman*, 4th Dist. Athens No. 08CA15, 2009-

Ohio-952, ¶ 20, citing *State v. Bowie*, 4th Dist. Washington No.

01CA34, 2002-Ohio-3553, ¶ 8, 12, and 16, citing *Whren*; *see also*

*Harper* at ¶ 24.  Moreover, the Supreme Court of Ohio has held,

"Where a police officer stops a vehicle based on probable cause

that a traffic violation has occurred or was occurring, the stop is

not unreasonable under the Fourth Amendment to the United States

Constitution even if the officer had some ulterior motive for

making the stop[.]" *Dayton* at paragraph one of the syllabus.

**{¶25}** In the case sub judice, Trooper Day articulated

sufficient facts that gave him reasonable suspicion or probable

cause to stop appellant's vehicle. As evidenced by Day's testimony and the video, appellant did not illuminate his headlights (or taillights and license plate light) in violation of R.C. 4513.03(A)(1) ("Every vehicle * * * operated upon a street or highway within this state shall display lighted lights and illuminating devices * * * during all of the following times: * * * The time from sunset to sunrise.") Thus, Day possessed a sufficient basis for the traffic stop.

{¶26} Appellant next asserts that, even if the initial stop complied with the Fourth Amendment, Trooper Day improperly expanded the scope of the stop. Appellant argues that Day had no reason to remove appellant from the vehicle, conduct a pat down search for weapons, place appellant in the cruiser, and search appellant's vehicle.

{¶27} In general, "[w]hen a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates." *State v. Aguirre*, 4th Dist. Gallia No. 03CA5, 2003-Ohio-4909, ¶ 36, citing *State v. Carlson*, 102 Ohio App.3d 585, 598, 657 N.E.2d 591 (9th Dist.1995). Pursuant to *Rodriguez v. United*

*States*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), ordinary inquiries incident to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez* at 349. "'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" *Aguirre* at ¶ 36, quoting *Carlson* at 598, 657 N.E.2d 591, citing *State v. Cook*, 65 Ohio St.3d 516, 521-522, 605 N.E.2d 70 (1992)(15-minute detention reasonable). *See also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)(20-minute detention reasonable); *Harper* (14-minute detention did not impermissibly extend traffic stop).

{¶28} In addition, once an officer lawfully stops a driver, the officer may order the driver to exit the vehicle without additional justification. *State v. Kilbarger*, 4th Dist. Hocking No. 11CA23, 2012-Ohio-1521, ¶ 16, citing *State v. Huffman*, 2d Dist. Clark No. 2010-CA-104, 2011-Ohio-4668, ¶ 8; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), fn. 6, *State v. Alexander-Lindsey*, 2016-Ohio-3033, 65 N.E.3d 129, ¶ 14 (4th Dist.)("officers can order a driver and a passenger to exit

the vehicle, even absent any additional suspicion of a criminal violation"). However, "the officer must 'carefully tailor' the scope of the stop 'to its underlying justification,' and the stop must 'last no longer than is necessary to effectuate the purpose of the stop.'" *State v. Marcinko,* 4th Dist. Washington No. 06CA51, 2007-Ohio-1166, ¶ 26, quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶29} A traffic stop becomes "'unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350, 135 S.Ct. 1609, quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). After "the reasonable * * * time for issuing [a] citation has [elapsed], an officer must have a reasonable articulable suspicion of illegal activity to continue the detention." *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13 (2d Dist.). Thus, "[a]n officer may expand the scope of the stop and may continue to detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v. Rose*, 4th Dist. Highland No. 06CA5, 2006-Ohio-5292, ¶ 17, citing *State v. Robinette*, 80 Ohio St.3d 234, 240, 685 N.E.2d 762 (1997).

**{¶30}** As the *Robinette* court explained, when a police officer's objective justification to continue the detention of a person is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts that give rise to a suspicion of some illegal activity to justify an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure. *Id.* at paragraph one of the syllabus. Conversely, "if a law enforcement officer, during a valid investigative stop, ascertains 'reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual.'" *Rose* at ¶ 17, quoting *Robinette* at 241, 685 N.E.2d 762; *State v. Jones,* 4th Dist. Washington No. 03CA61, 2004-Ohio-7280, ¶ 24.

**{¶31}** Additionally, a lawfully detained vehicle may be subjected to a canine check of the vehicle's exterior even without the presence of a reasonable suspicion of drug-related activity. *See State v. Dukes,* 4th Dist. Scioto Nos. 16CA3745, 2017-Ohio-7204, ¶ 23, citing *State v. Rusnak*, 120 Ohio App.3d 24, 28, 696 N.E.2d 633 (6th Dist.1997). "Both Ohio courts and the United States Supreme Court have determined that 'the exterior sniff by a trained narcotics dog to detect the odor of drugs is not a search within

the meaning of the Fourth Amendment to the Constitution.'" *Dukes* at ¶ 23, quoting *Jones* at ¶ 24. Thus, a canine check of a vehicle may be conducted during the time period necessary to effectuate the original purpose of the stop. *Jones* at ¶ 24; *Harper* at ¶ 29. However, "so long as it is conducted during the time period necessary to effectuate the original purpose of the stop." *Dukes* at ¶ 24.

{¶32} "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 788, 172 L. Ed. 2d 694 (2009). Generally, questions about travel plans are ordinary inquiries incident to a traffic stop. *See United States v. Dion*, 859 F.3d 114, 125 (1st Cir.2017)("[O]ur case law allows an officer carrying out a routine traffic stop * * * to inquire into the driver's itinerary."); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir.2011)(tasks related to a traffic violation include "inquiring about the occupants' destination, route, and purpose"); *United States v. Brigham*, 382 F.3d 500 (5th Cir.2004)(absence of authorized driving, inconsistent explanation regarding reason for trip and passenger's fake ID justified continued detention); *United States v. Williams*, 271 F.3d 1262,

1267 (10t Cir.2001)("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.")

**{¶33}** In *United States v. Villavicencio,* 825 Fed.Appx. 88 (2020), during a traffic stop for speeding the officer asked travel-related questions not pertinent to the traffic violation, issued the driver a warning ticket, and then asked a passenger for consent to search the vehicle that contained evidence of trafficking in counterfeit access devices. *Id.* at 89. The Fourth Circuit Court of Appeals held that the officer's testimony that the vehicle traveled on a known drug corridor and the front seat passenger rented the vehicle in a source state for narcotics entered the reasonable suspicion calculus. *Id.* at 98, citing *United States v. Brugal*, 209 F.3d 353, 358 (4th Cir.2000)(en banc)(travel along I-95 and departure from a source city factors contributing to reasonable suspicion); *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir.2004)(characteristics of location where officer encounters vehicle is significant factor in formulating reasonable suspicion). The *Villavicencio* court also noted that the defendant's itinerary did not suggest "innocent travel," as the officer reasonably concluded that "common sense suffices to justify this inference" that most innocent travelers would not spend $630 to rent a vehicle in Orlando, Florida, proceed to drive most of the

night and into the next morning to a sparsely populated area in North Carolina, which they had no familiarity with, to visit girls for approximately 24 hours before driving back to Florida. *Id*. at 101, citing *Kansas v. Glover*, 589 U.S. __, 140 S.Ct. 1183, 1188, 206 L.Ed.2d 412 (2020). The court noted that the reasonable suspicion standard does not ask what is plausible, *Navarette v. California*, 572 U.S. 393, 403, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), but instead is based on "commonsense judgments and inferences about human behavior." *Glover*, 140 S.Ct. at 1188, quoting *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

{¶34} The *Villavicencio* court also pointed to *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) where the Supreme Court found "probative significance" in the fact that Sokolow traveled from Honolulu, Hawaii "for 20 hours to spend 48 hours in Miami during the month of July." *Sokolow* at 9, 109 S.Ct. 1581. The court noted that the "out of the ordinary travel helped establish the reasonable suspicion that Sokolow was transporting illegal drugs," and the *Villavicencio* court, concluded, "[l]ikewise here." *Id.* at 101. Moreover, the court found ample evidence of reasonable suspicion of criminal activity independent of the initial traffic violation. "More importantly, [the officer]'s reasonable suspicion developed while she was completing the traffic

stop mission related activities and before issuing the warning ticket to [the defendant]." *Id.* Thus, because the officer possessed reasonable suspicion that criminal activity could be afoot, she could constitutionally direct the defendant to remain in her cruiser and question the passenger. *Id.* at 102.

**{¶35}** Other courts have encountered facts that involve dubious travel plans, rental vehicles, and travel to and from source cities to support a reasonable suspicion of criminal activity. *See, e.g., State v. Waldroup,* 100 Ohio App.3d 508, 654 N.E.2d 390 (12th Dist.1995)(officer's observation of defendant's unusual demeanor, short-term car rental for a cross-country round, and defendant traveled from area of New Mexico known for drug trafficking gave rise to reasonable suspicion); *State v. Perry*, 12th Dist. Preble No. CA2004-11-016 2005-Ohio-6041, ¶ 13 (defendant and passenger remained nervous throughout stop, details of rental agreement, appellant's dubious answers regarding travel plans, abrupt exit from interstate, and defendant and passenger's various inconsistent explanations provided reasonable and articulable facts giving rise to reasonable suspicion.); *State v. Carey*, 4th Dist. Ross No. 11CA3286, 2013-Ohio-1855, ¶ 24 (rental car is typically a modus operandi for transportation of drugs); *State v. Whitehead*, 4th Dist. Scioto No. 20CA3931, 2022-Ohio-479, ¶ 47 (officer testified

individuals who transport drugs commonly use rental cars to avoid detection).

{¶36} Turning to the case sub judice, several oddities and inconsistencies arose during the traffic stop regarding appellant's travel. Trooper Day reviewed the rental agreement and learned that appellant rented the vehicle in Chicago, Illinois that morning. Appellant told Day that he planned to stay in Beckley, West Virginia three or four days, but Day knew that in view of the distances involved, returning the vehicle to Chicago within a day added up to "dubious travel plans", a "weighty factor" in establishing reasonable suspicion to extend the stop. *See United States v. Williams*, 68 F.4th 304, 208 (2023), citing *United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir.2016)(quoting *United States v. Stepp*, 680 F.3d 651, 666 (6th Cir.2012)). Day also observed that appellant and his fellow passengers traveled between a source city (Chicago) and a destination city (Beckley), that appellant acted "overly nervous," "shaking and stuttering," and did not know the name of his front seat passenger (his cousin's friend). *See also United States v. Ledbetter,* 929 F.3d 338, 347 (6th Cir.2019) (overly nervous behavior * * * may contribute to reasonable suspicion).

{¶37} The trial court noted that Trooper Day called in the

license plate at about 20 seconds into the stop, then at about one minute approached the vehicle on the passenger side. Day spoke with appellant and noticed that he acted "overly nervous," more nervous than a person would normally be on a traffic stop. Day explained how to turn on the headlights, and appellant told Day they came from Chicago headed to Beckley, and planned to stay "three or four days." The court also pointed out that you could hear Day note that the vehicle was a rental. Day testified that he was not sure at that point what action he would take, but due to his training, experience and drug interdiction work since 2014, he knew drug traffickers commonly use rental cars and that Route 35 is a "common drug trafficking route from 'source' cities, such as Chicago to 'user' cities in West Virginia."

{¶38} The trial court further observed that at about two and one-half minutes into the stop, Trooper Day returned to his cruiser to check appellant's information. Day testified that during this time, he reviewed the rental agreement and the information from a computer search and noticed that the agreement required appellant to return the rental car to Chicago before the end of appellant's stated visit to West Virginia. The trial court noted that at this juncture Day testified he "might issue a warning to the Defendant but was concerned that the Defendant's story did not match the return date on the rental agreement."

{¶39} The trial court also pointed out that Trooper Day returned to appellant's vehicle at about five minutes into the stop, and, after five and one-half minutes, Day asked appellant to exit the vehicle. Around the six-minute mark, appellant told Day he did not know the front seat passenger's name. At six and one-half minutes Day told appellant he intended to review appellant's criminal history and the court explained that Day testified that he wanted to obtain appellant's criminal history to help decide whether to issue a citation or a warning. When Day told appellant that the rental agreement appeared to require him to return the car to Chicago before appellant could complete his trip, appellant could not explain the discrepancy.

{¶40} After seven minutes into the stop, Trooper Day decided to walk his canine around appellant's car while he waited for the criminal history. Day conceded, however, that at this point he suspected criminal activity may be afoot in addition to the traffic violation. At eight minutes into the stop, Day asked appellant what would appear on his criminal record and appellant replied only traffic violations. Appellant also consented to a pat down search for weapons.

{¶41} Trooper Kuehne, who arrived at the scene nine and a half minutes into the stop, testified that he heard the travel plan

discussion and heard appellant "stumble" to explain the discrepancy with the Beckley trip. At ten and one-half minutes into the stop, Kuehne approached the vehicle to inform the passengers about the canine walk-around. Kuehne testified that the passengers told him they intended to go to Beckley "to see some girls at a hotel," but Kuehne knew this statement to be inconsistent with the information appellant told Day. After Day requested appellant's criminal history from dispatch, Day retrieved his canine at about 11 minutes. At 11½ minutes, Kuehne reached into the vehicle and seized an object that he immediately recognized as contraband. After Kuehne showed the bag to Day, Day returned the dog to his cruiser because the officers now had probable cause to search the vehicle. The trial court also observed that the inconsistencies in travel plans and inconsistencies in a passenger's identification constituted pertinent factors in the reasonable suspicion analysis.

{¶42} At the trial court level, appellant relied on *United States v. Chivers*, S.D. Ohio No. 1:19-cr-119, 2020 WL 5757135 (Sept. 28, 2020). In *Chivers,* two troopers (one in training) stopped a vehicle for speeding. In addition to the defendant, two other passengers occupied the vehicle. The men told officers they came from Richmond, Indiana and intended to go to Cincinnati, Ohio (a 67-mile trip) and drove a rental car. After they obtained

identification, the troopers returned to their vehicle, ran the identifications, and discussed the stop.  One trooper remarked that the front-seat passenger was "frozen like a mannequin," "rigid, locked-on appearance," and had a "heightened sense of nervousness." The other trooper testified that he only remembered that the front seat passenger appeared nervous.  The report showed that Chivers possessed a valid driver's license and no open warrants existed for anyone in the vehicle.  *Id.* * 2.

{¶43} While one trooper entered the occupant's information, the other removed Chivers from the vehicle, then frisked and questioned him with questions unrelated to the speeding violation.  After the other trooper obtained the men's information, instead of writing a citation he returned to the vehicle to engage in non-related conversation.  When the passengers provided conflicting information regarding their destination, the troopers requested a canine.

{¶44} At about 11 minutes into the stop, one trooper began to write a citation.  Thirty seconds later, the troopers took their first detailed look at the rental agreement and, after another 30 seconds, noted that the person who rented the car was not present. Almost 14 minutes into the stop, dispatch reported locating a drug dog and the troopers waited for eight minutes in their cruiser.  At that point, troopers removed Chivers from his car, frisked him

again and questioned him about the rental agreement. About 27 minutes into the stop, troopers informed Chivers that the canine had arrived. After the dog alerted, officers searched the car and found a gun.

**{¶45}** The federal district court concluded that approximately eight minutes into the stop, troopers ceased to pursue the traffic violation and, instead, launched an unrelated criminal investigation that prolonged the stop. *Id.* at *9. Further, the court held the officers had no reasonable suspicion to justify the prolonged stop to investigate unrelated potential criminal activity. The court discounted the facts that the occupants traveled at 1:30 a.m. down a "common drug corridor," as well as the men's nervousness, noting that nervousness can be unreliable, citing *United States v. Stepp*, 680 F.3d 651, 665 (6th Cir.2012).

**{¶46}** In the case sub judice, the trial court distinguished the *Chivers* 27-minute stop and concluded that the time expended in this stop took 11 ½ minutes, that during the interaction the officers "diligently pursued the objectives of a traffic stop," "did nothing outside of normal, acceptable duties and that those duties did not prolong this traffic stop." The court emphasized that at 11 ½ minutes, Trooper Day "still had not received information about Defendant's criminal history." Thus, the court found that the

officers did not impermissibly extend the stop and Day subsequently possessed a reasonable articulable suspicion to believe criminal activity could be afoot.

**{¶47}** Appellant also cites *State v. Lawler*, 2020-Ohio-849, 152 N.E.3d 962 (3d Dist.). After an officer stopped a vehicle for failure to signal and discovered that neither the driver nor the defendant owned the vehicle, the officers requested a canine because of the driver's nervous behavior. About 15 minutes after the stop, the officer learned that, although the driver and passenger had permission to "use" the car, the driver had a suspended driver's license and should not have been driving. Rather than re-approach the vehicle, the trooper waited for 25 minutes until the canine unit arrived. About 36 minutes after the initial stop, the canine alerted to drugs. *Id.* at ¶ 2-4.

**{¶48}** The Third District held that, although the officer may have had reason to extend a traffic stop for "some period of time" beyond that necessary to investigate the driver's failure to signal a lane change and issue a warning or citation, it did not justify the full length of the detention. *Id.* at ¶ 30. The court held, "we cannot conclude that Trooper Prather diligently pursued a means of investigation likely to confirm or dispel his suspicions that

[the driver] had violated R.C. 2913.03 or that he was driving under suspension." *Id.* at ¶ 43. Further, the court could not conclude that the canine sniff occurred within the period of time reasonably required for the officer to complete the tasks associated with the initial traffic stop or with the driver's possible driving under suspension offense. *Id.* at ¶ 33.

{¶49} We, however, believe the *Lawler* facts are distinguishable from the facts in the case at bar. The main distinguishable factor is that Trooper Day testified that it normally takes more than 13 minutes to issue a traffic citation or a warning, and here he discovered the drugs in less time (11 ½ minutes into the stop). In addition, the rental car, dubious travel plans, travel along a known drug corridor, and the appellant not knowing the front seat passenger's name also distinguish this case from *Lawler* and contribute to reasonable suspicion. Finally, we agree with the trial court's assessment that the officers diligently pursued the objectives of the stop and did nothing outside of normal, acceptable duties that did not unnecessarily prolong the stop.

{¶50} Therefore, we agree with the trial court's conclusion that the initial traffic stop, the investigatory detention, and the search of appellant's vehicle did not violate the Fourth Amendment. Thus, we conclude that the trial court properly overruled

appellant's motion to suppress evidence.

{¶51} Accordingly, based on the foregoing reasons, we overrule appellant's first assignment of error.

II.

{¶52} In his second assignment of error, appellant asserts that the trial court erred when it denied his Daubert motion. Specifically, appellant argues that under Evid.R. 702, the Daubert decision, and the Sixth Amendment notice and confrontation clauses, a trial court must only admit scientifically reliable evidence. Here, appellant claims, "the massive unexplained discrepancy in the tested weights of the contraband at bar indicates scientific unreliability."

{¶53} In general, a trial court's decision regarding the admissibility of expert testimony will not be disturbed absent an abuse of discretion. *See Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), citing *Calderon v. Sharkey*, 70 Ohio St.2d 218, 436 N.E.2d 1008 (1982); *State v. Williams*, 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶ 9. The term "abuse of discretion" implies that a court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Kirkland,* 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67, quoting *State v. Brady,*

119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.  When an appellate court applies the abuse of discretion standard of review, it is not free to merely substitute its judgment for that of the trial court.  *State v. Darmond,* 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34; *State ex rel. Duncan v. Chippewa Twp. Trustees,* 73 Ohio St.3d 728, 732, 654 N.E.2d 1254 (1995).

Evid.R. 702 speaks to the admissibility of expert testimony:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result. Evid.R. 702.

**{¶54}** Evid.R. 702(C) establishes a threshold standard of

reliability that a proponent must meet before an expert's opinion is admissible in evidence. *State v. Nemeth*, 82 Ohio St.3d 202, 212, 694 N.E.2d 1332 (1998); *Williams, supra,* at ¶ 18. When determining whether an expert's opinion is reliable under Evid.R. 702(C), the inquiry "focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct * * *." *Miller, supra,* paragraph one of the syllabus. "To determine reliability, * * * a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 611, 687 N.E.2d 735, citing *Daubert v. Merell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶55} Additionally, "[t]he Sixth Amendment's Confrontation Clause provides, 'In all criminal prosecutions, the accused shall enjoy the right * * * t be confronted with the witnesses against him * * *.'" *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34. The Confrontation Clause of the Sixth Amendment is made applicable to the states by the Fourteenth Amendment. *State v. Issa,* 93 Ohio St.3d 49, 752 N.E.2d 904, fn. 4 (2001). Thus, the constitutional right applies to both federal and state prosecutions, but the right of confrontation in Article I, Section 10 of the Ohio Constitution provides no greater right of

confrontation than the Sixth Amendment. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12. The United States Supreme Court has interpreted the Sixth Amendment to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Maxwell* at ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**{¶56}** In the case sub judice, appellant contends that, although the trial court relied on Ohio State Highway Patrol Crime Lab Director Brandon Werry's testimony, his testimony concerning the consistency between the trooper's field weight and Klontz's weight determination did not address the discrepancy with Boyko's initial lab weight. Furthermore, the assertion that no other issues arose in the handling or testing did not provide a comprehensive account of the methods employed, their accuracy, or their reliability. Finally, the belief that the item Klontz tested is the same item the troopers submitted insufficiently addresses the issues in the handling, chain of custody, and testing.

**{¶57}** Although the state recognized that the trooper's cocaine field test weight result (377 grams) differed from Klontz's lab

weight test result (365.9 grams), Klontz described the methods used
to test the content and weight of the substance, and explained the
equipment and lab procedures. Moreover, as the state highlights,
even though the initial lab test weight exceeded the field weight
and the second lab weight, the disputed weight measurement would
not change the level of offense to appellant's detriment. The
state thus argues that the trial court properly denied appellant's
motion because the field weight and second lab test results are
similar, the testing methods are accepted in the field and approved
in the lab manual, and that no tampering occurred with the sealed
container, the factors identified in *Daubert* have been satisfied.
Thus, appellee reasons, the trial court did not abuse its
discretion when it admitted the expert testimony on the
identification and weight of the cocaine.

{¶58} On March 10, 2021, the trial court held a hearing to
consider appellant's motion. Ohio State Highway Patrol Crime
Laboratory Criminalist Alena Boyko testified that she identifies
controlled substances and testifies in court. However, before
Boyko testified in the case at bar, defense counsel moved to
continue the hearing because the state did not provide counsel with
the instrument's calibration records or the lab operator's manual.

{¶59} After several continuances, on April 11, 2022 the trial

court held the suppression hearing. Ohio State Highway Patrol Criminal Lab Supervisor Kara Klontz testified for the state, and Director Brandon Werry for the defense. Klontz tested the substances on April 6 and 7, 2021 and analyzed two separate items, 001-01, a package of white powder, and 001-02, a gray solid fragment. Klontz performed two tests to identify the first substance, 365.9 grams of cocaine, plus or minus 2.8 grams. Klontz stated that the retest occurred as part of a "quality assurance audit," and that, although the test revealed the same findings regarding the content of the substances, her weight measurement differed from the first criminalist's weight measurement. The second substance, identified as heroin, weighed 47.5 grams, plus or minus 2.8 grams.

{¶60} Klontz testified that in a previous case the prior criminalist (Boyko) had misidentified a substance. Klontz acknowledged that her weight measurement and Boyko's prior weight measurement differed by 85 and one-half grams, but she could not explain the reason for the discrepancy. Klontz stated that "[t]he chain of custody and the markings on the evidence were consistent," but she could not "know 100% that we weighed and tested the same substance." Klontz indicated that vendor annually calibrated the Mettler Toledo machine, but "we check our balance daily prior to

use."

**{¶61}** Director Brandon Werry testified that when Boyko's misidentification of a substance in another case came to the lab's attention, the lab audited all her work, including work in the case at bar and 155 other cases. Werry testified that they ruled out anything that might have affected the scale itself and determined that no sample was missing. Werry also stated that typically in an investigation of this nature, he would interview the first criminalist, but Boyko resigned during her administrative investigation and before her interview. Therefore, Werry could not explain the weight discrepancy.

**{¶62}** The trial court denied the appellant's motion to suppress and summarized:

> Ms. Klontz testified that she used testing methods that are acceptable in the field – FTIR and GCMS- to test the substance and that these methods are approved methods from in the lab's manual. (1)(4). She also confirmed that the methods used have documented sensitivity, specificity, accuracy, precision, and linearity. (2). Ms. Klontz testified that the methods used have been peer reviewed and documented. (3).

> Ms. Klontz testified that there were no inconsistencies in the processing of the sample tested and that no tampering with the sealed sample container was detected. (5)(6). Further, Ms. Klontz testified that the sample container was properly labeled, there were not temperature requirements for the sample and the sample was retained in accordance with the laboratory's written procedure manual. (13).

Ms. Klontz testified that her work is audited every year and that she must complete proficiency examinations every year. (31).

As to the discrepancy in the weight of the substance, Brandon Werry, Crime Lab Director for the Drug Chemistry Section for OSP, testified that the field weight of the substance and the weight of the substance as determined by Ms. Klontz were consistent. The first lab weight determined by a prior analyst, Boyko, was in excess of both the field weight and the weight determined by Ms. Klontz. Director Werry testified that he has not been able to determine the cause for the discrepancy in the weight measurements. However, he also testified that there were no other issues or problems in how the substance was handled and tested. Director Werry testified that he believes the item tested by Ms. Klontz is the item submitted by the Troopers in this case.

**{¶63}** After our review of this issue, we agree with the trial court's conclusion. We first observe that a witness need not make a talismanic incantation concerning scientific certainly when their testimony has otherwise established that they are speaking pursuant to their "specialized knowledge, skill, experience, training, or education." Evid.R. 702(B); *State v. Hooks,* 12th Dist. Butler No. CA2021-12-148, 2022-Ohio-4132, ¶ 36. Regarding the failure to explain the weight discrepancy, the state did prove the chain of custody for the substances and need not negate all possibilities of substitution or tampering. *See State v. Parsley,* 10th Dist. Franklin No. 09AP-612, 2010-Ohio-1689, ¶ 30. Moreover, as the state points out, Criminalist Boyko's previous cocaine weight

measurement does not change the level of offense or the outcome of this proceeding.  As the state also points out, Klontz's weight measurement (365.9 grams) is close to the field measurement (377 grams).  Therefore, we conclude that the trial court did not abuse its discretion concerning the admissibility of the evidence in question.

{¶64} Accordingly, for all of the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover from appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal

commences from the date of filing with the clerk.