# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 11-1756

———————

United States of America,

          Appellee,

v.

Kenneth Floyd Bowman,

          Appellant.

\*
\*
\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  Northern District of Iowa.
\*
\*

———————

Submitted: October 21, 2011
Filed: October 28, 2011

———————

Before RILEY, Chief Judge, SHEPHERD, Circuit Judge, and MAGNUSON,[1]
District Judge.

———————

MAGNUSON, District Judge.

Kenneth Floyd Bowman appeals from the District Court's[2] denial of his motion to suppress evidence seized during the traffic stop that led to his arrest and conviction. We affirm.

———————

[1]The Honorable Paul A. Magnuson, United States District Court Judge for the District of Minnesota, sitting by designation.

[2] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

## I.    BACKGROUND

### A.    Procedural

On March 10, 2010, Appellant Kenneth Floyd Bowman was arrested after the search of his vehicle following a routine traffic stop yielded nearly 3,000 grams of cocaine. Bowman was subsequently charged with possession to distribute more than 500 grams of cocaine after having been convicted of a felony drug offense. On May 5, 2010, Bowman moved to suppress the cocaine seized from his car. After full briefing and a hearing on the suppression motion, the magistrate judge[3] issued a Report and Recommendation ("R&R") recommending that Bowman's motion be denied. Bowman filed an objection to the R&R, which was overruled by the District Court. Bowman did not appear for trial. The Grand Jury subsequently issued a superseding indictment adding a new charge for Bowman's failure to appear.

On September 24, 2010, Bowman entered a conditional guilty plea to the cocaine charge and an unconditional guilty plea to the failure-to-appear charge. Bowman reserved the right to appeal the denial of his motion to suppress. Bowman was sentenced to 120 months imprisonment on the cocaine charge and 30 months on the failure-to-appear charge, to run consecutively. Bowman now appeals the denial of his motion to suppress.

### B.    Factual

On the afternoon of March 10, 2010, an Iowa State Patrol Trooper observed Bowman's vehicle, a late 1980s black BMW with Utah plates, heading east on Interstate 80. The Trooper noticed that the BMW had dark tinted windows. The

---

[3]The Honorable Jon R. Scoles, United States Magistrate Judge for the Northern District of Iowa.

Trooper pulled alongside the BMW and clocked it at 71 mph. Neither Bowman nor his passenger looked at the Trooper as they were driving side by side. The Trooper decided to pull Bowman over.[4]

The Trooper recorded the entire stop with his dashboard video equipment.[5] At 1:33 p.m., the Trooper exited his patrol car and approached Bowman's car. The Trooper informed Bowman and his passenger of the reason for the stop. The Trooper testified at the suppression hearing that when he approached the vehicle he noticed that the interior of the car had a "lived-in look;" there were clothes hanging in the back seat area, suitcases in the back seat, and trash on the floor. There were also three cell phones visible in the car. The passenger was eating a bag of Chex Mix quickly and messily, like "the cookie monster." The Trooper also tested the window tint and calculated the visible light at 28%. Iowa requires visible light to be at least 70%. Bowman gave the Trooper his Utah license and his passenger, Oscar Flores, provided a Mexican ID card.

Two minutes into the stop, the Trooper told Bowman that he would write him warning tickets and asked Bowman to join him in the patrol car. The Trooper noticed that Bowman smelled like air freshener, which, the Trooper testified, is often used to mask drug odors. The Trooper also noticed that Bowman's breathing was fast-paced and that his carotid artery was pulsing rapidly. The Trooper and Bowman talked generally about where Bowman was headed and for what purpose. Bowman said that

---

[4]The Trooper made this decision, in part, on the mistaken belief that Bowman was driving in a construction zone with a speed limit of 55. In any event, Bowman was speeding (albeit less than originally thought) and the darkness of the window tint violated Iowa law, so the Trooper had valid cause to pull Bowman over. Bowman does not dispute the propriety of the stop.

[5]The Magistrate Judge and the District Court both viewed the DVD and relied on its contents in making the decision at issue. The Court also has reviewed the DVD.

he and Flores were headed to Chicago for a week on business. Bowman said that he did not know where they would be staying. The Trooper then asked whether Bowman had been arrested before. Bowman responded that he had been arrested 20 years prior for "paraphernalia."

The Trooper called in Bowman's information to run a check on him and his vehicle. The dispatcher indicated that she had gotten "quite a few results back" for Bowman. Bowman had been in the patrol car for about 7 minutes when the Trooper told Bowman that he needed the vehicle identification number ("VIN") from the car. The Trooper then went to Bowman's car, retrieved the VIN, and talked to Flores for about 2 ½ minutes. Flores told the Trooper that he did not know where they were going, where they were staying, or how long they would be gone. The Trooper testified that Flores appeared "really nervous," that he was bouncing his leg, and that he avoided eye contact. When the Trooper returned to the patrol car, he received a report from dispatch stating that she would send Bowman's record via email. The Trooper then completed the tickets, handed them to Bowman, and said "you have a nice trip." Bowman exited the patrol car at 1:47 (14 ½ minutes after the initial stop).

After Bowman exited the patrol car, the Trooper followed him and said "have you got time for couple of quick questions?" Bowman responded "yeah." The Trooper then asked Bowman whether he had anything illegal in the car, including weapons and controlled substances. Bowman answered "no" to the questions asked and said "I don't do drugs." The Trooper then asked whether he could search the car. Bowman asked why he wanted to search the car and the Trooper told him that he had "some indicators." The Trooper then said "you don't want me to search?" to which Bowman responded "no." The Trooper then asked whether Bowman "would mind waiting for a canine to do a free air sniff of the car; is that cool?" Bowman responded "yeah, that's cool."

The canine unit arrived at 1:53. The canine handler and the dog, Jake, then began the sniff search. At 1:57 Jake alerted to the presence of narcotics at the rear passenger side door. After Jake's alert, additional officers arrived and assisted in the search of the car for 30 minutes. When no narcotics were found, the car was driven to a DOT facility where a more extensive search of the car revealed cocaine in a compartment behind the rear seat, in the vicinity of where Jake alerted.

## II.  DISCUSSION

### A.  Standard of Review

When reviewing a denial of a motion to suppress, the Eighth Circuit reviews the district court's factual findings for clear error and its conclusions of law de novo. United States v. Taylor, 636 F.3d 461, 463 (8th Cir. 2011). In this case, the facts are not in dispute. Thus, the task at hand is to determine whether the District Court's conclusions of law were correct. As set forth below, the District Court's denial of Bowman's suppression motion was consistent with the law in every respect.

### B.  Reasonableness of the Time Taken to Perform the Traffic Stop

Bowman argues that the District Court erred in determining that the traffic stop was not impermissibly prolonged. Bowman restricts this argument to the time period beginning with the stop itself (at 1:33) and ending when the Trooper handed Bowman the tickets and told him to have a safe trip (at 1:47). Bowman contends that this 14-minute stop was in violation of his Fourth Amendment right because it was longer than necessary to complete the mission of the stop. Bowman adds that the Trooper had no indication during that time period that criminal activity was afoot.

Bowman is correct that a constitutionally permissible traffic stop can become unlawful "if it is prolonged beyond the time reasonably required to complete that

mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). However, during a traffic stop, an officer may detain the occupants of the vehicle "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999). The tasks include "asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005). If complications arise during these routine tasks, the vehicle may be detained for a longer period of time. United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007). Whether a traffic stop "is reasonable in length is a fact intensive question, and there is no per se time limit on all traffic stops." Id.

Bowman relies on United States v. Peralez, 526 F.3d 1115 (8th Cir. 2008), in support of his argument that the stop was too long. In Peralez, the Eighth Circuit determined that the officer's stop of Peralez was unreasonably delayed by the trooper's "'blended process' of conducting a drug interdiction investigation during the course of a run-of-the-mill traffic stop" and that the length of the stop violated the Fourth Amendment.[6] Id. at 1120. The court determined that the officer's questioning unrelated to the reason for the stop more than doubled the time Peralez was detained. Id.

In contrast, here, the Trooper spent the 14-minute period at issue completing the tasks attendant to the stop. The Trooper did not ask Bowman questions about possible criminal activity until after the stop was completed, and that questioning was

---

[6] The conclusion in Peralez that the officer unreasonably prolonged the traffic stop was not necessary to the court's decision and, accordingly, has been deemed non-binding dicta. United States v. Suitt, 569 F.3d 867, 871 (8th Cir. 2009).

-6-

fairly prompted by the Trooper's growing suspicions during the 14-minute stop caused by Bowman's and Flores' obvious nervousness, their inconsistent stories, and other factors.

This case is much more akin to United States v. Suitt, 569 F.3d 867 (8th Cir. 2009), in which the period in question involved routine questioning related to the stop, and during which the defendant behaved in such a way as to raise the trooper's suspicions that the driver was engaged in criminal activity. As in this case, the officer in Suitt became more and more suspicious during the traffic stop, thus leading him to reasonably believe that criminal activity was afoot and that a search (also via dog sniff) was warranted. As the panel noted in Suitt, "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." Id. (quoting United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002)). Based on his suspicions, the officer in Suitt asked drug interdiction questions after he issued the warning tickets. The panel ruled that there was reasonable suspicion to prolong the stop for additional questioning after the basis for the initial stop had been resolved.

The same reasoning applies here. The Trooper carried out the mission of the initial stop in a reasonable time frame. During that time, the Trooper noticed various things that raised his suspicions that Bowman may have been involved in criminal activity. Thus, the Trooper's prolonged stop of Bowman was legitimate and did not violate Bowman's Fourth Amendment rights. This aspect of the appeal should be denied.

## C.    Seizure After the Warning Tickets were Issued

Bowman also argues that he was impermissibly seized after the Trooper issued the warning tickets because the Trooper prevented him from leaving. This argument is also meritless.

A person is seized within the meaning of the Fourth Amendment "only if, if view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 545 (1980).

The DVD of the stop is the best evidence of what happened; it confirms that written record which supports the conclusion that the interaction between the Trooper and Bowman after the tickets were issued was cooperative and consensual. The Trooper asked Bowman if he would answer additional questions and Bowman replied "yeah" and then responded to those questions, all of which were drug interdiction questions. The Trooper then asked Bowman if he would consent to a search of his car, to which Bowman responded "no." (This alone indicates that Bowman understood that he was not required to comply with the Trooper's requests.) Then Bowman told the Trooper that he was "cool" with a dog-sniff search. There are no facts that would indicate a Fourth Amendment seizure occurred. This appeal point is thus also without merit.

## D.    Existence of Reasonable Suspicion

Bowman next argues that if the court agrees with him that he was seized, the Trooper did not have reasonable suspicion to do so. To justify a Fourth Amendment

seizure, the officer must have a reasonable, articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 20 (1968). The reasonable suspicion standard requires "at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Id. at 123-24.

Here, the Trooper had a long list of observations that reasonably made him suspicious of Bowman. Among those observations were the following: the tinted car windows; the fact that the vehicle was newly registered; Bowman smelled of air freshener; Bowman and Flores were palpably nervous; Bowman's story was not credible and was inconsistent with that of Flores; the car had a "lived-in look;" there were three visible cell phones in the car; and Bowman had an acknowledged criminal history involving drugs.

Based on the above, the Trooper would have had reasonable, articulable suspicion to seize Bowman, even if the stop could be deemed a seizure within the purview of the Fourth Amendment.

### E.   Consent to Dog Sniff

Bowman next argues that the dog-sniff search was impermissible because he was coerced into consenting to the search. For this purpose the DVD again is instructive as it shows the actual interactions between the Trooper and Bowman, which are consistent with the written record. The DVD does not support Bowman's claim that the Trooper physically intimidated him into consenting to the dog search. To the contrary, the Trooper was congenial with Bowman throughout their interaction. And Bowman does not dispute that he told the Trooper that it would be

"cool" if the Trooper called for a canine unit to perform a dog-sniff search of the car. This appeal point utterly lacks merit.

**F.      Probable Cause to Search the Vehicle**

Bowman's final argument on appeal is that the dog-sniff search was unreliable and thus could not serve as probable cause for the physical search of the car, which led to the discovery of the cocaine.  Bowman acknowledges that if, Jake, the drug-detection dog, is "reliable," there was probable cause for the search.

Law enforcement officials require probable cause to search a vehicle without a warrant. United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003). Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007).  "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." Id. (quoting United States v. Sundby, 186 F.3d 873, 875–76 (8th Cir. 1999)). Bowman argues that Jake is not reliable because he has a history of alerting to the presence of narcotics when the odor is residual.  Bowman does not dispute that Jake is trained and certified to conduct sniff searches; he trains 4-5 hours per week and is re-certified annually.  Jake's handler testified at length about Jake's training and significant experience in the field.  Moreover, Jake does not have a significant history of false alerts to the presence of narcotics.  There is simply no basis upon which to conclude that Jake is inherently unreliable and that there was no probable cause for the physical search of Bowman's car.

## III. CONCLUSION

For all of the above reasons, we conclude that the District Court's decision to deny Bowman's motion to suppress was correct.

Accordingly, we affirm.

_____