[Cite as *State v. Lansing*, 2025-Ohio-1241.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | |
|---|---|
| STATE OF OHIO, | : |
| Plaintiff-Appellant, | : CASE NO. 24CA19 |
| v. | : |
| MISTY LANSING, | : DECISION AND JUDGMENT |
| Defendant-Appellee. | : |

_____

APPEARANCES:

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellant.

Jeffrey M. Blosser, Chillicothe, Ohio, for appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:4-3-25
ABELE, J.

{¶1}  The State of Ohio, pursuant to R.C. 2945.67(A) and Crim.R. 12(J), appeals a Ross County Common Pleas Court judgment that suppressed evidence found during a search of a vehicle driven by Misty Lansing, defendant below and appellee herein, and occupied by Ariel Ballein, a co-defendant below.  Appellant assigns the following error for review:

ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED BY GRANTING THE MOTION
TO SUPPRESS."

{¶2} During a March 2024 traffic stop, Ohio State Highway
Patrol Trooper Tyler Boetcher discovered methamphetamine in a
vehicle driven by appellee and occupied by passenger co-defendant
Ariel Ballein.  A Ross County Grand Jury later returned an
indictment that charged both appellee and Ballein with (1) one
count of aggravated possession of drugs in an amount equal to or
exceeding 100 times the bulk amount in violation of R.C. 2925.11,
and (2) one count of aggravated trafficking in drugs in an amount
equal or exceeding 100 times the bulk amount in violation of R.C.
2925.03, both first-degree felonies.  Appellee and Ballein entered
not guilty pleas.

{¶3} Subsequently, appellee and Ballein filed motions to
suppress the evidence discovered during the traffic stop.  At the
suppression hearing, Trooper Boetcher testified that at
approximately 10:00 p.m. on February 23, 2024, he worked in the
drug interdiction unit when dispatch notified him of a call

regarding a "reckless, possibly impaired driver."  Boetcher obtained the description of a gold Ford sedan and registration number, drove to the area, and searched for the vehicle.  After Boetcher observed the Ford traveling in a group of three vehicles, he "checked all three at a speed above the posted speed limit, but not blazing speeds, and I performed a U-turn . . . and proceeded to follow the three vehicles not knowing - at the time I did not know that center vehicle was the vehicle I was dispatched to."  After the rear car turned off the roadway, Boetcher identified the gold Ford sedan and observed it pass the lead vehicle.  Boetcher checked the Ford's speed at 68 miles per hour using radar.  Boetcher testified that 65 miles per hour "is ten miles an hour over the posted speed limit."

{¶4}  Appellant played Trooper Boetcher's body camera video at the suppression hearing.  At minute 1:30 of the video, appellee's vehicle stops.  At 1:47, Trooper Boetcher first speaks with appellee on the vehicle's driver's side.  Appellee states, "I'm just trying to find my wallet," and asks Boetcher, "how are you this evening?"  Boetcher replies, "not too bad."

{¶5}  At 2:17, Trooper Boetcher states, "find it?" and appellee replies, "Yes."  Boetcher asks, "car belong to you, ma'am?," appellee replies, "Yes."  At 2:24, Boetcher asks, "where ya coming from tonight?"  Appellee replies, "from my sister's up in Marysville."  When asked where she is headed, appellee said, "Pike county ... my house."  When asked, "are you in a hurry tonight?" Appellee responded that her daughter in Pike County had to go to work in the morning and she needed to watch her granddaughter. When asked, how long were you up in Marysville, appellee hesitated and replied, "like two hours."  When asked, "what were you up there for," appellee hesitated and said, "what was I up there for?"  When Boetcher said, "Yes," appellee said, "just visiting."  Boetcher asked, "just visiting?"  Appellee replied, "yeah."  The conversation ends at 3:15.

{¶6}  Trooper Boetcher and Lieutenant Melanie Provenzano reenter the cruiser at 3:30 of the video.  Provenzano asks, "wonder how old she is," and Boetcher says, "45."  At 4:00 of the video, Boetcher says, "carried on a good conversation with me . . . I mean . . . don't have anything in her eyes . . . normal reactions."  At

4:08, Boetcher says, "I'll get her out of here, be right back." At 4:10, Boetcher exits his cruiser.

{¶7} At 4:21, Trooper Boetcher again approached appellee's vehicle and said, "Alright, is there anything in the vehicle the K-9 is going to indicate to?" Appellee hesitates, shakes her head, looks away, and says, "No." Boetcher said, "No?" Appellee looks at Boetcher and says, "no, not that I know of." At 4:30, Boetcher says, "go ahead and hop out for me for a minute." At 4:36, appellee exits the vehicle and at 4:40, Boetcher tells her to "go back there at the front of my car." As appellee starts to walk toward Boetcher's cruiser, at 4:42 Boetcher says, "Hey ma'am, ma'am come here. See that pipe and that twist baggie?" Appellee returns, looks in the vehicle, and says, "oh." Boetcher says, "yeah," and at 5:02, Boetcher advises appellee of her *Miranda* rights. After that, he questioned appellee and she admitted that the vehicle contained methamphetamine, and told him, "I just had what's in my pipe."

{¶8} At 8:15 of the video, Trooper Boetcher removed passenger Ballein from the vehicle. At 9:14, Boetcher informed Ballein that

the traffic stop had turned into a criminal investigation "because there is drugs and paraphernalia in plain view in the vehicle." Boetcher handcuffed Ballein and searched her.  Boetcher then searched the vehicle.  Initially, Ballein refused to reveal her identity.  However, after Boetcher told her she would go to jail if she did not identify herself, Ballein gave her name and admitted she had outstanding warrants.  Part of the video does not contain audio, so it is unclear when or whether Trooper Boetcher or Lieutenant Provenzano advised Ballein of her *Miranda* rights.  After a full search of the vehicle, officers found a large amount of methamphetamine.

{¶9}  Trooper Boetcher testified that his primary reason for the stop originated with the "reckless impaired driver" report, and the secondary reason "speeding."  Boetcher testified that "from the time of the traffic stop until the time that I pulled the defendant out of the vehicle was less than three minutes.  From the time of my first contact, I think just over - less than four minutes from the time. . . I turned my lights on."  When asked how long "it usually takes for you to issue a traffic citation or warning,"

Boetcher replied, "written warning, possibly five to seven minutes. Citation seven to ten?" Boetcher stated that the average traffic stop is "seven to fifteen minutes." However, if the driver is impaired, "it's an hour or two." Boetcher testified that "every one of my traffic stops is different. You can - one thing if criminal activity is afoot, one thing we are trained to do is separate the parties involved, but you can also question them together. Each - each traffic stop is fluid and different."

{¶10} When asked at what point he decided to have the driver exit the vehicle, Trooper Boetcher replied, "I decided to pull the driver from the vehicle was the - the moment I asked her to step out of the vehicle." When asked why, Boetcher explained,

> I was dispatched there . . . to investigate a reckless
> possibly impaired driver, one. Two the - the defendant
> had stated that she was enroute from Marysville to Pike
> County and then she further states her home. Knowing the
> . . . State Route 104 is not a direct route from Marysville
> or any sub areas around Marysville to the Latham area. . .
> the direct route does not even bring you through the
> northern . . . portion of Ross County. . . so that's another
> reason. Also, as I reapproached the vehicle I had
> realized, taking a step back and realized that the
> passenger of the vehicle had not spoken to my Lieutenant
> that was standing at her window during the traffic stop,
> nor - nor myself. She had stared straight ahead throughout
> the entirety of the traffic stop. Which is abnormal. And

then the drivers questions - or when I would ask the driver a question on two separate occasions that I can recall she either prolonged or re-asked the question. Which is not in [and] of itself abnormal but can be evasive on questioning.

{¶11} Trooper Boetcher testified that he generally removes drivers from their vehicles when he investigates an impaired driver. Boetcher explained that he and his Lieutenant "were working a detail in the City of Chillicothe" that night, so they "were in a rush" at the beginning of the stop. Boetcher also stated that appellee's answer, "not that I can think of," is "not an normal answer." "Through my experience, a 'not that I can think of' is indicative of there either has been or is something in the vehicle that a K-9 is going to indicate to." Boetcher testified that, although he said to his Lieutenant that he was going to "get her out of here," he did not say that to the driver, and only made that statement because "I was in a hurry trying to get back to the - the detail we were assigned to work." Lieutenant Provenzano did not testify.

{¶12} On cross-examination, Trooper Boetcher acknowledged that he initiated the traffic stop at 10:32 p.m. Boetcher stated that,

although at the 4:08 minute mark of the bodycam video he said "let's get her out of here," Boetcher asserted that between the time he exited his patrol car and walked to appellee's vehicle, he continued to investigate.

{¶13} On cross-examination by Ballein's attorney, counsel asked, "and you never asked the passenger at any time, up to this point when you pull Ms. Lansing out, you had not asked Ms. Ballein any questions."  Trooper Boetcher responded, "I had not."  When asked whether his Lieutenant asked any questions of Ballein, Boetcher responded, "I - she - she did not."  When asked if his reason for "pulling Ms. Lansing out of the vehicle was that - one of the reasons I should say was that Ms. Ballein had not spoken to you or your lieutenant?," Boetcher replied, "No Ma'am.  She was - she was staring straight ahead, which is not normal through my experience when stopping vehicles.  The passenger is not locked, staring just straight ahead in a - in a motor vehicle."  Boetcher conceded that because of the relatively brief stop, Ballein only stared straight ahead "a couple of minutes."

**{¶14}** The trial court granted appellee's suppression motion after the parties submitted written closing arguments. Although the court made no findings of fact or conclusions of law in its entry, at the June 3, 2024 status conference hearing the court stated that Trooper Boetcher made a valid traffic stop because appellee exceeded the posted speed limit. The court observed, however, that after appellee's driver's license and registration check and Boetcher's statement to his Lieutenant that he "was going to get them out of here," the traffic stop had ended and Boetcher extended the stop for "an impermissible period of time." The court specifically noted that it found no significance in the passenger Ballein's silence and stated that nothing suggested Ballein's impairment or that she committed any infraction other than sitting quietly and staring straight ahead.

**{¶15}** This appeal followed.

I.

**{¶16}** Appellant asserts in its assignment of error that the trial court erred when it granted the motion to suppress evidence. In particular, appellant contends that the trial court: (1) made

findings not based on all competent, credible evidence in the record relevant to a reasonable suspicion/totality of the circumstances analysis; (2) applied an incorrect analysis and erroneously determined that Trooper Boetcher completed the initial stop's mission, (3) failed to consider the totality of the circumstances and the duration of the stop, (4) failed to assess what a reasonably prudent officer would do, and (5) failed to consider that an officer may briefly ask questions before releasing a motorist, then request a driver to exit a vehicle when the answers are dubious.

{¶17} In general, appellate review of a trial court's ruling on a motion to suppress evidence involves a mixed question of law and fact. *State v. Gurley*, 2015-Ohio-5361, ¶ 16 (4th Dist.), citing *State v. Roberts*, 2006-Ohio-3665, ¶ 100; *State v. Jones*, 2022-Ohio-561, ¶ 15 (4th Dist.). At a suppression hearing, a trial court acts as the trier of fact and is best positioned to resolve factual questions and evaluate witness credibility. *Gurley; State v. Burnside*, 2003-Ohio-5372, ¶ 8. Therefore, appellate courts " 'must accept the trial court's findings of fact if they are supported by

competent, credible evidence.' " *State v. Leak*, 2016-Ohio-154, ¶ 12, quoting *Burnside* at ¶ 8. Accepting those facts as true, reviewing courts " 'independently determine as a matter of law, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id.*, quoting *Burnside* at ¶ 8; *State v. Dunbar,* 2024-Ohio-1460, ¶ 21 (4th Dist.).

**{¶18}** The Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals against unreasonable governmental searches and seizures. *State v. Shrewsbury*, 2014-Ohio-716, ¶ 14 (4th Dist.), citing *State v. Emerson*, 2012-Ohio-5047, ¶ 15; *Delaware v. Prouse*, 440 U.S. 648 (1979). "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion of the evidence obtained from the unreasonable search and seizure at trial." *Shrewsbury*, citing *Emerson* at ¶ 15; *State v. Harper*, 2022-Ohio-4357, ¶ 23 (4th Dist.).

**{¶19}** A traffic stop initiated by a law enforcement officer constitutes a seizure within the meaning of the Fourth Amendment.

*Whren v. United States*, 517 U.S. 806, 809-810 (1996). Thus, a traffic stop must comply with the Fourth Amendment's general reasonableness requirement. Id. An officer's decision to stop a vehicle is reasonable when the officer has probable cause or reasonable suspicion to believe that a traffic violation has occurred. *Id.* at 810, 116 S.Ct. 1769 (citations omitted); *accord State v. Mays*, 2008-Ohio-4539, ¶ 23; *Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996). Law enforcement officers also may stop a vehicle if they have reasonable suspicion "that criminal activity " 'may be afoot.' " " *United States v. Arvizu*, 534 U.S. 266, 273 (2002), quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989), quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *accord State v. Tidwell*, 2021-Ohio-2072, ¶ 19 (officer may "make an investigatory stop, including a traffic stop, of a person if the officer has reasonable suspicion to believe that the person is or is about to be engaged in criminal activity").

{¶20} Relevant to the case at bar, a police officer who observes a de minimis violation of traffic laws may stop a driver. *State v. Debrossard*, 2015-Ohio-1054, ¶ 13 (4th Dist.), citing *State*

*v. Guseman*, 2009-Ohio-952, ¶ 20 (4th Dist.), citing *State v. Bowie*, 2002-Ohio-3553, ¶ 8, 12, and 16 (4th Dist.), citing *Whren*; see also *Harper* at ¶ 24.  Moreover, the Supreme Court of Ohio has held, "Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop[.]" *Dayton* at paragraph one of the syllabus.

**{¶21}** In general, a traffic stop may last no longer than necessary to accomplish the initial goal of the stop:

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" - to address the traffic violation that warranted the stop and attend to related safety concerns.  Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate tha[at] purpose."  Authority for the seizure thus ends when tasks tied to the traffic infraction are - or reasonably should have been - completed.

*Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  The United States Supreme Court explained that tasks tied to traffic infractions include: (1) determining whether to issue a traffic ticket, (2) checking the driver's license, (3) determining the

existence of outstanding warrants, (4) inspecting the vehicle's registration, and (5) examining proof of insurance. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* at 355.

**{¶22}** Similar to a *Terry v. Ohio*, 392 U.S. 1 (1968) stop, the tolerable duration of police inquiries in a traffic-stop context is determined by the seizure's "mission" - to address the traffic violation that warranted the stop, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), and attend to related safety concerns. *State v. Kincaid*, 2024-Ohio-2668, ¶ 15 (4th Dist.); *see also United States v. Sharpe*, 470 U.S. 675, 685 (1985); *Florida v. Royer*, 460 U.S. 491, 500 (1983)(plurality opinion)("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Id*. *See also Caballes,* 543 U.S. at 407. Authority for the seizure thus ends when tasks tied to the traffic infraction are - or reasonably

16

should have been - completed. *See Sharpe*, 470 U.S. at 686 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation"). *Rodriguez*, 575 U.S. 348 at 354.

**{¶23}** Thus, after a reasonable time for the purpose of the original traffic stop to elapse, an officer must then have " 'a reasonable articulable suspicion of illegal activity to continue the detention.' " *State v. Jones*, 2022-Ohio-561, ¶ 22 (4th Dist.), quoting *State v. Ramos*, 2003-Ohio-6535, ¶ 13 (2d Dist.)

> When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continuing detention to conduct a search constitutes an illegal seizure.

*State v. Robinette*, 80 Ohio St.3d 234 (1997), paragraph one of the syllabus.

**{¶24}** Therefore, if, after talking with a driver, a reasonable police officer would be satisfied that no unlawful activity had

occurred, the driver must be permitted to continue on his or her way.  *State v. Venham*, 96 Ohio App.3d 649, 656 (4th Dist. 1994). However, if an officer "ascertained reasonably arcticulable facts giving rise to the suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual."  *Robinette* at 241.  The detention of the motorist may last as long as the reasonable suspicion of criminal activity continues.  "However, the lawfulness of the initial stop will not support a 'fishing expedition' for evidence of another crime." *Venham, supra,* at 655.

{¶25} Thus, "[t]he detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." *State v. Bathchili*, 2007-Ohio-2204, ¶ 15, citing *State v. Myers*, 63 Ohio App.3d 765, 771 (2d Dist. 1990); *Venham*, 96 Ohio App.3d 649, 655, *State v. Howard*, 2006-Ohio-5656, ¶ 16.  The "reasonable and articulable" standard applied to a prolonged traffic stop encompasses the totality of the circumstances."  *Id.* at ¶ 17,

citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002). However, *Rodriguez v. United States*, *supra*, prohibits seizures that result from inquiries unrelated to the purpose of a traffic stop that "measurably extend[s] the duration of the stop." *See also State v. Chatton*, 11 Ohio St.3d 59, 63 (1984)("Once the suspicion which gave rise to the initial stop evaporated, any additional intrusion or detention had to have been supported by specific and articulable facts demonstrating the reasonableness of the continued detention.")

{¶26} The Supreme Court of Ohio has also instructed: "The 'reasonable and articulable' standard applied to a prolonged traffic stop encompasses the totality of the circumstances, and a court may not evaluate in isolation each articulated reason for the stop." *Batchili*, paragraph two of the syllabus. Again, "[i]n determining whether a detention is reasonable, the court must look at the totality of the circumstances." *State v. Matteucci*, 2003-Ohio-702, ¶ 30 (11th Dist.). The totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about

19

the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu*, 534 U.S. at 273, quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981). Thus, the pertinent question in the case sub judice is whether Trooper Boetcher's decision to ask at the three-minute mark of the traffic stop, "Alright, is there anything in the vehicle the K-9 is going to indicate to?," impermissibly extended the stop.

**{¶27}** As a threshold matter, we note that in the instant case the trial court made no findings of fact in its entry that granted the motion to suppress evidence. Moreover, Crim.R. 12(F) provides: Where factual issues are involved in determining a motion, the court shall state its essential findings on the record, and a trial court speaks through its journal entries. *State v. Schulz*, 2014-Ohio-1037, ¶ 3 (9th Dist.). However, we have the suppression hearing transcript, as well as the parties' arguments, and can properly review the issues on appeal. *State v. Steed*, 2016-Ohio-8088, ¶ 26 (6th Dist.).

**{¶28}** Turning to the merits of appellant's appeal, to evaluate the propriety of an investigative stop, a reviewing court must

examine the totality of the circumstances that surround the stop as "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). Here, neither party disputes the justification for the traffic stop. Thus, the relevant inquiry is whether Trooper Boetcher possessed the authority to ask the appellee to exit her vehicle.

**{¶29}** The status conference hearing transcript reveals that, in determining to grant the suppression motion, the trial court appears to have attached great significance to Trooper Boetcher's statement, "I'll get her out of here, be right back," and noted, "perhaps if he hadn't made the statement to the Lieutenant sitting next to him we wouldn't of known what his intentions were, but he made them very clear when he made the statement," "so I find that based upon that he extended the stop for an impermissible period of time, and therefore everything after that stop should be suppressed." In addition, the court emphasized, "I'm at a loss of how the passenger's actions . . . that didn't involve intoxication, inebriation, clearly had nothing to do with the reckless driver . .

. how the passengers response to the traffic stop, of staring straight ahead and remaining silent is . . . indicative of anything to do with the traffic stop or illegal behavior." The court went on to note that it is "every American's constitutional right when faced with law enforcement, to stare straight ahead and be quite [sic.] if that's what they want to do, especially if they're not the driver of the vehicle, who is required to provide at least some information." Appellant, however, asserts that the trial court erred when it did not utilize the required totality of the circumstances analysis, isolated one factor (the silence and staring of the passenger), failed to consider whether the officer diligently pursued the investigation, and failed to consider the duration of the traffic stop.

**{¶30}** First, we begin with the premise that during a traffic stop, an officer may order all occupants to step out of a vehicle pending completion of the traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 414 (1997); *accord State v. Grubbs,* 2017-Ohio-41, ¶ 29 (6th Dist.). *See also Pennsylvania v. Mimms*, 434 U.S. 106, 111, n. 6 (1977) ("once a motor vehicle has been lawfully detained for a

22

traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures."); *State v. Maddux,* 2010-Ohio-941, ¶ 6 (officer may order a motorist to step out of vehicle which has been properly stopped for a traffic violation); *State v. Kilbarger*, 2012-Ohio-1521, ¶ 16 (4th Dist.)(once an officer lawfully stops a driver, the officer may order the driver to exit the vehicle without additional justification); *State v. Alexander-Lindsey*, 2016-Ohio-3033, ¶ 14 (4th Dist.)("officers can order a driver and a passenger to exit the vehicle, even absent any additional suspicion of a criminal violation").  However, we again recognize that "the officer must 'carefully tailor' the scope of the stop 'to its underlying justification,' and the stop must 'last no longer than is necessary to effectuate the purpose of the stop.' "  *State v. Marcinko*, 2007-Ohio-1166, ¶ 26 (4th Dist.), quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983); *State v. Dunbar*, 2024-Ohio-1460, ¶ 28 (4th Dist.).

{¶31} In the case sub judice, appellee asserts that *Mimms* should not apply because the initial traffic stop concluded when

Trooper Boetcher privately stated to Lieutenant Provenzano that he planned to "get her out of here." However, we point out that in *Mimms* the officer testified regarding his practice to require a defendant exit the car during every traffic stop. *Mimms* at 111. In the case at bar, Trooper Boetcher also testified that he generally removes drivers from their vehicles when he investigates an impaired driver. Moreover, the United States Supreme Court characterized the "additional intrusion" of exiting a vehicle as "de minimis" — "a mere inconvenience [that] cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* at 111. *See also State v. Evans*, 67 Ohio St.3d 405, 408 (1993) ("[A] *Mimms* order does not have to be justified by any constitutional quantum of suspicion."). Additionally, regardless of Boetcher's private statement to his Lieutenant, Boetcher testified that, as he reapproached the vehicle, other factors also arose that caused him to suspect possible criminal activity. *Batchili* at ¶ 15.

{¶32} Recently, in *State v. Holler*, 2023-Ohio-2528 (9th Dist.), an officer stopped Holler's vehicle for a traffic violation,

approached the vehicle, requested driver's license and registration, and returned briefly to the cruiser to determine whether outstanding warrants existed. The officer, who had not yet processed a citation, again approached the vehicle and shined his flashlight in the backseat and asked Holler whether he had any contraband. Holler acknowledged that he "had consumed one beer and that he was nervous about receiving a citation." After the officer asked Holler to exit the vehicle, the officer asked whether Holler possessed anything illegal. Holler told the deputy that he had an open beer in a cooler and the officer asked permission to search the car. Holler also acknowledged that he had a firearm in the car and he did not have a concealed-carry permit. At that point, the officer informed Holler that he would be detained, discovered an Adderall tablet during a pat-down, and found additional contraband when he searched Holler's vehicle. *Id.* at ¶ 2-3.

{¶33} On appeal, Holler argued that *Mimms* did not apply and the trial court incorrectly concluded that sufficient justification existed to ask him to exit the vehicle. The Ninth District, however, noted that after *Mimms,* the United States Supreme Court

further concluded that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Holler* at ¶ 11, citing *Whren,* 517 U.S. at 813. The court further observed that this principle also applies when an officer orders a driver to exit a vehicle once a traffic stop is in progress. *Id.,* citing *Ohio v. Robinette*, 519 U.S. 33, 38-39.

**{¶34}** *Holler* explained that the Ohio Supreme Court has observed that under *Whren* and *Mimms*, "the officers' subjective motivation for continuing the detention is irrelevant." *Holler* at ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 239 (1997) ("*Robinette II*"). Thus, the court held:

> In this case, as in *Robinette*, the deputy obtained Mr. Holler's driver's license and returned to his cruiser. When the deputy approached for a second time, without having prepared a citation in the meantime, he asked Mr. Holler to step from the vehicle for the purpose of determining why he appeared to be more nervous than a driver might usually be. The deputy's subjective rationale in asking Mr. Holler to step from the vehicle was "irrelevant" for purposes of the Fourth Amendment. *Robinette II* at 239. *See also Whren* at 813. Mr. Holler's contention that "*Pennsylvania v. Mimms* does not apply" is, therefore, incorrect, and the trial court did not err by denying his motion to suppress.

*Holler* at ¶ 12. We believe *Holler* is instructive in the case sub

judice.  Here, Trooper Boetcher's subjective rationale in ordering appellee and Ballein to exit the vehicle should be deemed irrelevant for Fourth Amendment purposes.

{¶35} Appellees contend that any investigation that occurred after Trooper Boetcher privately told his colleague that he intended to allow appellee and Ballein to leave had to be supported by a reasonable, articulable suspicion that either appellee or Ballein possessed illicit drugs and, therefore, Boetcher's inquiry regarding the K-9 impermissibly extended the stop.  Appellant, however, points out that the trial court did not make any finding regarding the duration of the stop, other than to conclude that Trooper Boetcher extended the stop "for an impermissible time." However, in *Arizona v. Johnson*, 129 S. Ct. 781 (2009), the United States Supreme Court reaffirmed its holding that an expanded inquiry of a lawfully stopped motorist about other crimes does not violate the Fourth Amendment: "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  *Id.* at 788.

{¶36} Here, appellant asserts that the officer "had an aha moment" as he returned to appellee's vehicle "in which the circumstances of the entire stop came together in his head, less

than three minutes from pulling the driver over." Appellant quotes Trooper Boetcher's testimony: "When I was reapproaching the vehicle I kind of took a step back and - realized what I was seeing and then just asked the question, is there anything in the vehicle a K-9 is going to indicate to." In particular, appellant points to (1) the odd indirect route Lansing had been driving (especially given that Lansing indicated her attempt to hurry), (2) the evasiveness and peculiarity of Lansing's reasons for speeding, (3) the "slouching passenger's failure to make eye contact or even move when an officer stood outside her door, which a trained nine-year veteran found to be peculiar," and (4) the trooper's knowledge that another motorist had called regarding suspicion of impaired driving.

{¶37} Appellant points out that this court has previously examined the duration of a traffic stop in the light of what constitutes a reasonable time for the purpose of the original traffic stop to elapse. However, appellees argue that this court's recent decision in *State v. Netter*, 2024-Ohio-1068 (4th Dist.), held that *Rodriguez* "prohibits seizures that result from inquires unrelated to the purpose of a traffic stop that 'measurably extend the duration of the stop.'" *Id.* at ¶ 22.

{¶38} In *Netter*, during a traffic stop an officer continued to request and enter information from the driver at minute 8:30 of the

dash camera video, while another officer approached the vehicle at 10:00 to explain the canine walk-around protocol.  At 11:10, the canine approached the vehicle and, by 11:27, the canine alerted to the presence of drugs in the vehicle.  *Id.* at ¶ 26.  We emphasized that while officers awaited the canine, the trooper "diligently checked the driver's license, registration, and criminal history," and concluded that the canine sniff did not unconstitutionally prolong the stop.  *Id.* at ¶ 27.  Importantly, we also examined specific stop durations concerning the constitutionality of extending a legitimate traffic stop for a canine sniff.  We wrote:

> [O]ther Ohio courts have concluded that a very brief stop, similar to the duration of the stop in the present case, does not violate the Fourth Amendment.  *See State v. Johnson*, 2d Dist. Montgomery No. 20624, 2005-Ohio-1367, 2005 WL 678922 (no violation when officer testified typical stop requires 15-20 minutes to complete and sniff occurred 7 minutes into stop), *State v. Blatchford*, 2016-Ohio-8456, 79 N.E.3d 97 (12th Dist.)(no violation when officer testified normal traffic stop between 15-20 minutes, dog arrived within ten minutes and alerted within 12 ½ minutes), *State v. Cook*, 65 Ohio St.3d 516, 521-522, 605 N.E.2d 70 (1992) (15 minute detention reasonable). *See also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (20 minute detention reasonable); *Illinois v. Caballes*, 543 U.S. 405, 410, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (no constitutional violation when canine sniff less than 10 minutes after initiation of stop, defendant placed in cruiser and officer not yet issued a citation); *Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, at ¶ 14 (no evidence to suggest detention for traffic violation of sufficient length to make it constitutionally dubious when dog alerted 8 minutes and 56 seconds into the stop and neither background check nor traffic citation had been completed); *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E.2d 1138, ¶ 23 (6th

Dist.)(no violation when canine sniff within 15 minutes of stop, a reasonable time to process a traffic citation).

*Id.* at ¶ 25.

**{¶39}** Unlike *Netter*, the case sub judice did not involve a canine sniff. Here, Trooper Boetcher stated to Lieutenant Provenzano, "carried on a good conversation with me . . . I mean . . . don't have anything in her eyes . . . normal reactions . . . I'll get her out of here, be right back." Like *Netter*, Trooper Boetcher diligently pursued the stop's purpose and, in light of Boetcher's typical stop duration, this three-minute traffic stop did not extend beyond a reasonable time for a traffic stop. Boetcher testified that the time expended for an average traffic stop is 7-15 minutes; a typical traffic stop takes 5 to 7 minutes for a written warning, 7-10 minutes for a citation, and "an hour or two" to investigate an impaired driver. In the case sub judice, Boetcher testified that "from the time of the traffic stop until the time that I pulled the defendant out of the vehicle was less than three minutes." Thus, although Boetcher did not issue a citation or warning, we see nothing to suggest that appellee's and Ballein's three-minute detention for the traffic violation extended beyond the permissible time to make the stop constitutionally dubious. *Batchili* at ¶ 14.

{¶40} In addition, appellant cites *State v. Landers*, 2007-Ohio-7146 (10th Dist.) in support. In *Landers,* the officer stopped the driver suspected of impaired driving, obtained identification, and returned to his cruiser to speak with his sergeant. During the next ten minutes, the officer performed background checks on the driver and passenger and discussed how to proceed, given his concern that the driver acted "nervous and figety." *Id.* at ¶ 2. The background check revealed that the vehicle's plates had expired. After writing a warning, the officer wished to further investigate the driver's possible impairment, so he asked the driver to exit the vehicle. As the driver complied, a plastic tube fell from the driver's lap onto the road. The officer placed the warning on top of the driver's vehicle and, when the officer recognized the item as drug paraphernalia, he immediately arrested the driver. *Id.* at ¶ 3.

{¶41} *Landers* noted that during a valid traffic stop an officer may order the driver to exit the car pending completion of the stop, even without suspicion of criminal activity. *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *State v. Evans*, 67 Ohio St.3d 405, 408 (1993). However, the court underscored that an officer has no right to detain a driver, or to order a driver to exit a vehicle after the purpose of the stop had been accomplished and no articulable facts exist to justify the continued detention.

*Landers* at ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234 (1997). The Tenth District concluded that the officer "had not completed the purpose of the stop when he ordered [Landers] out of the car. Therefore, the case at bar is distinguishable from *Robinette*. Because [the officer] had not completed the purpose of the stop, he had the right to order appellee out of the car." *Id.* at ¶ 13.

{¶42} Relevant to the case sub judice, appellee argues that the trial court properly granted the motion to suppress because the officer admitted that he requested the driver to exit the vehicle "to further investigate whether appellee was under the influence of some substance." *Id.* at ¶ 14. The Tenth District, however, noted that an officer's purported purpose in asking a driver to exit a vehicle is irrelevant.

> The United States Supreme Court has "'flatly dismissed the idea that an ulterior motive might serve to strip the [police] of their legal justification.'" *State v. White*, Wayne App. No. 05CA0060, 2006-Ohio-2966, at ¶ 10, quoting *Whren*, at 812; see, also *State v. Trembly* (June 30, 2000), Washington App. No. 99CA 03 (noting that officer's subjective intentions play no role in probable cause analysis or investigative stops). Pursuant to *Mimms,* Officer Cahill was justified in asking appellee out of the car, regardless of his motive for doing so. *State v. Henderson*, Lake App. No. 2006-L-110, 2007-Ohio-2315, at ¶ 28 (not considering officer's motive in asking driver out of car); *State v. Coleman*, Cuyahoga App. No. 79816, 2002-Ohio-2387, at ¶ 20 (affirming officer's request for driver to get out of car).

*Landers* at ¶ 14. Further, the *Landers* court found the length of detention reasonable, and noted that it took approximately ten minutes to check the driver's and passenger's licenses and to write the warning, and the entire incident took less than 15 minutes. Thus, the court held that the officer did not unreasonably prolong the traffic stop. *Id.* at ¶ 16. In addition, the *Landers* court cited this court's decision in *State v. Trembly*, 2000 WL 875948 (4th Dist. June 30, 2000), that held that an officer's subjective intentions "play no role in probable cause analysis." *Id.* at * 3, citing *Whren*, 517 U.S. at 813. "This concept applies equally to investigative stops." *Id.*, citing *State v. Thompson*, 1997 WL 120212 (4th Dist. March 12, 1997).

{¶43} Appellant highlights the similarities between *Landers* and the case at bar, and asserts that in this case the trooper consulted with his supervisor and, while still investigating driver impairment, asked one additional question, received a dubious response, then asked Lansing to exit the car. Appellant points out that the trial court made no findings regarding the duration of time between the stop, the question regarding whether a K-9 would alert, and when Boetcher asked appellee to exit the vehicle. Thus, appellant argues that, although the trial court characterized the stop's purpose as complete, it did not consider the totality of all the evidence regarding whether all of the trooper's suspicions

about the driver's impairment had been dispelled. Consequently, appellant requests this court to conclude that the trial court erred when it found that Trooper Boetcher's private statement made to his supervisor is dispositive because (1) an officer's subjective intent is not determinative, and (2) the trial court failed to consider all relevant factors or to apply a totality of the circumstances analysis.

{¶44} In the case at bar, unlike *Landers*, Trooper Boetcher did not decide to write a warning or issue a traffic citation. However, like *Landers* Trooper Boetcher testified that it typically takes him 5-7 minutes to write a warning, 7-10 minutes to write a citation, and an average stop is 7-15 minutes, but if the driver is impaired, "it's an hour or two." Here, Trooper Boetcher first approached Lansing at 1:45 of the video and at 4:42 of the video spotted drug paraphernalia and drugs, with the entire encounter taking less than 3 minutes.

{¶45} In *State v. Gurley*, 2015-Ohio-5361 (4th Dist.), the officer stopped the defendant for a traffic violation and discovered that the defendant possessed a suspended license with limited driving privileges. A canine alerted 5 minutes into the stop while the stop lasted approximately 30 minutes. *Id.* at ¶ 25. The officer testified it typically takes 10-12 minutes to issue a citation during a routine traffic stop. Thus, we held that the

officer possessed reasonable suspicion to expand the traffic stop's scope and in view of these facts the 30-minute stop constituted a reasonable duration. *Id.* at ¶ 28.

{¶46} Appellant further contends that, even if the purpose of the original traffic stop had ended, Trooper Boetcher nevertheless possessed a reasonable, articulable suspicion of illegal activity to continue the detention. Once again, appellant argues that the officer testified (1) regardless of his private statement to his Lieutenant, he continued to investigate Lansing's suspected impairment, (2) State Route 104 is not a direct route from Marysville to appellee's stated destination, so the route appeared to be suspicious, (3) when his Lieutenant approached the vehicle's passenger side, Ballein stared straight ahead, and the video shows Ballein "slouched down a ways in her seat" and she did not speak to either officer which is abnormal in Boetcher's experience, (4) appellee's reasons for speeding seemed to be evasive, (5) when Boetcher investigates an allegation of an impaired driver, he routinely asks the driver to exit the vehicle (6) Boetcher knew the call to dispatch involved appellee's possible impairment, (7) the stop occurred at night, (8) appellee "looked down and did not make eye contact" when asked about contraband in the vehicle, and (9) appellee answered suspiciously and hesitantly when prompted if a K-9 would alert ("not that I know of").

**{¶47}** Appellant also argues that a series of acts, each viewed in isolation perhaps innocent, may nonetheless, when viewed together, give a police officer justification to conduct further investigation. *State v. Shaibi,* 2021-Ohio-1352, ¶ 42 (12th Dist.), citing *State v. Ramey*, 129 Ohio App.3d 409, 414 (1st Dist.). Appellant also cites *State v. Steed*, 2016-Ohio-80808 (6th Dist.) when the court noted the officer observed Steed display "unusual actions" and asserted that Steed "did not respond correctly to her questions." *Id.* at ¶ 3. The Sixth District observed that, although the trial court did not specifically address the duration of the traffic stop, *Id.* at ¶ 26, the trial court properly denied the motion to suppress evidence and concluded that the officer possessed a reasonable articulable suspicion to prolong the traffic stop and to require Steed to exit the vehicle to continue her impairment investigation. *Id.* at ¶ 33. In *Steed*, however, the driver (1) stopped his car in the middle of the highway, (2) put the car in reverse, actively looking in the rearview mirror, (3) did not provide correct or complete answers, and (4) failed to timely comply with the officer's request for him to exit the vehicle until the officer ordered him more than six times. *Id.* at ¶ 30-31. In the case sub judice, appellee did not maintain consistent eye contact, appeared evasive when asked if a K-9 would indicate to her vehicle, offered her travel route that appeared to

be inconsistent with her stated travel plans, her reasons for speeding made no sense, the call to dispatch involved appellee's suspected impairment, and Boetcher believed it also suspicious when during the entire encounter the passenger slouched in her seat and stared straight ahead.

{¶48} Once again, in the case sub judice Trooper Boetcher testified that appellee did not maintain eye contact during the stop and the body camera video shows that, although initially appellee looked at Boetcher to answer questions and then looked back and forth at Boetcher while she searched her wallet for her license until she handed it to him at 2:37 of the video, appellee looked away four times during the discussion of her travel plans. Moreover, after Boetcher returned to appellee's vehicle and asked, "Is there anything in the vehicle the K-9 is going to indicate to?," appellee looked away from Boetcher and hesitated before saying, "No." Then, when Boetcher asked, "No?" Appellee looked at him and said, "No, not that I know of." Boetcher testified that in his years of nine years of experience, "not that I know of" "is not a normal answer," . . . and is indicative of there either has been or is something in the vehicle that a K-9 is going to indicate to. At that point, Boetcher ordered appellee to exit the vehicle and, within seconds, observed the pipe and baggie in plain sight.

{¶49} Regarding the trial court's observation that the

passenger stared straight ahead does not necessarily indicate suspicious conduct, the Third District recently addressed this issue in *State v. Lawler*, 2020-Ohio-849 (3d Dist.).  The Third District noted that some courts consider that a driver staring straight ahead while passing an officer may be, under certain circumstances, "appropriately considered as a potential indicator of criminal activity."  *Id.* at ¶ 38, citing *State v. Stephenson,* 2015-Ohio-233, ¶ 23 (12th Dist.)(driver's arms "locked out" and driver and passenger "staring straight ahead" and had rigid postures as factors supporting reasonable suspicion).  However, the Third District found it "dubious that [the driver and passenger's] failure to look at Trooper Prather constituted highly suspicious behavior."  *Id.*  The court characterized this behavior as "relevant to the formation of reasonable suspicion," although a "relatively weak indicator of criminal activity generally and of drug-related activity specifically."  *Id.*  Here, Boetcher discovered contraband in far less time than the average traffic stop (less than four minutes into the stop).  Consequently, we do not believe that in the case sub judice the officer "measurably extend the duration of the stop."  *Rodriguez* at 354.

{¶50} Moreover, as we noted above, Trooper Boetcher testified that appellee's travel plans did not make sense.  Appellee stated she "was enroute from Marysville to Pike County. . . knowing State

Route 104 is not a direct route from Marysville or any sub areas around Marysville to the Latham area . . . the direct route does not even bring you through the northern . . . portion of Ross County." Generally, questions about travel plans are ordinary inquiries incident to a traffic stop. *See United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017)("[O]ur case law allows an officer carrying out a routine traffic stop * * * to inquire into the driver's itinerary."); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011)(tasks related to a traffic violation include "inquiring about the occupants' destination, route, and purpose"); *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004)(absence of authorized driving, inconsistent explanation regarding reason for trip and passenger's fake ID justified continued detention); *State v. Dunbar*, 2024-Ohio-1460, ¶ 32 (dubious travel plans, rental vehicle, travel along known drug corridor and defendant not knowing front seat passenger's name contributed to reasonable suspicion.); *State v. Butcher*, 2020-Ohio-3524, ¶ 13 (9th Dist.)(although defendant claimed to be heading home, officer noted that his direction of travel did not make sense.); *but see State v. Byrd,* 2022-Ohio-4635 (8th Dist.)(officer's observation of driver's nervousness and belief that the driver's account of her travels did not "add up" did not constitute specific facts to support reasonable suspicion to justify officer extending traffic stop).

{¶51} In conclusion, after our review of the evidence adduced at the suppression hearing we believe that Trooper Boetcher properly stopped appellee after a call regarding an impaired driver that, in turn, led him to stop appellee for speeding. At the three-minute mark of the traffic stop, Boetcher properly requested appellee to exit her car before he completed the traffic stop. When appellee exited her vehicle, Boetcher observed a drug pipe and a baggie that contained methamphetamine. A subsequent vehicle search uncovered a large quantity of methamphetamine. In light of the foregoing, we cannot conclude that the very short duration of this traffic stop was unreasonably long or that the trooper's question added measurably to the stop's duration. Moreover, we also recognize that the detention of a stopped driver may continue beyond the normal time frame when the officer encounters additional facts that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop. Here, the officer received responses that raised additional concerns. *Batchili*, 2007-Ohio-2204, at ¶ 15, citing *Myers*, 63 Ohio App.3d at 771.

{¶52} Consequently, in the case at bar we conclude that under these facts, when viewed in total and taken together with rational inferences from those facts, during this traffic stop Trooper Boetcher properly asked driver, appellee, to exit the vehicle.

When appellee exited the vehicle, Boetcher then observed the contraband. Moreover, the facts adduced at the suppression hearing could also be viewed to have created a reasonable suspicion that criminal activity could be afoot and could have warranted a brief extension of the stop. *Burnside* at ¶ 8. Therefore, we believe the trial court erred when it granted appellee's motion to suppress such evidence.

{¶53} Accordingly, for all the foregoing reasons, we sustain appellant's assignment of error and reverse the trial court's judgment.

> JUDGMENT REVERSED AND CAUSE
> REMANDED FOR FURTHER PROCEEDINGS
> CONSISTENT WITH THIS OPINION.

JUDGMENT ENTRY

It is ordered that the judgment be reversed and the cause remanded for further proceedings. Appellant shall recover of appellee the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                          Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.